ORDER OF RAILROAD TELEGRAPHERS ET AL. *v.*
CHICAGO & NORTH WESTERN RAILWAY CO.

No. 100.   Argued March 1–2, 1960.—Decided April 18, 1960.

*Lester P. Schoene* argued the cause for petitioners.
With him on the brief were *Alex Elson, Brainerd Currie*
and *Philip B. Kurland.*

*Carl McGowan* argued the cause for respondent.   With
him on the brief was *Jordan Jay Hillman.*

*Solicitor General Rankin, Acting Assistant Attorney General Bicks* and *Charles H. Weston* filed a brief for the National Mediation Board, as *amicus curiae.*

*Clarence M. Mulholland, Edward J. Hickey, Jr.* and *James L. Highsaw, Jr.* filed a brief for the Railway Labor Executives' Association, as *amicus curiae,* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Austin L. Roberts, Jr.* for the National Association of Railroad and Utilities Commissioners, and by *Walter J. Cummings, Jr.* for the Bureau of Information of Eastern Railways et al.

MR. JUSTICE BLACK delivered the opinion of the Court.

According to the verified complaint filed in a United States District Court in Illinois by the respondent, Chicago & North Western Railway Company, against the petitioners, the Order of Railroad Telegraphers and its officials, "This is an action for injunction to restrain and enjoin the calling and carrying out of a wrongful and unlawful strike or work stoppage on plaintiff's railroad." Section 4 of the Norris-LaGuardia Act provides, however, that "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of *any labor dispute* to prohibit any person or persons . . . from . . . (a) Ceasing or refusing to perform any work or to remain in any relation of employment; . . ." [1] The main question in this case then was, and still is, whether this prohibition of the Norris-LaGuardia Act bars an injunction in the circumstances of this case.

Respondent railroad, owning and operating a rail system of over 9,000 miles in the States of Illinois, Wis-

---

[1] 47 Stat. 70, 29 U. S. C. § 104. (Emphasis supplied.)

consin, Iowa, Minnesota, Michigan, Nebraska, South Dakota, North Dakota, and Wyoming, is an integral part of the nationwide railway system important to the transportation of passengers and freight in interstate commerce. When the railroad began operations, about 100 years ago, traffic was such that railroad stations were established about 7 to 10 miles apart. Trucks, automobiles, airplanes, barges, pipelines and modern roads have reduced the amount of railroad traffic so that the work now performed at many of these stations by agents is less than one hour during a normal eight-hour day. Maintenance of so many agencies where company employees do so little work, the complaint alleges, is wasteful and consequently in 1957 the railroad filed petitions with the public utility commissions in four of the nine States in which it operated asking permission to institute a "Central Agency Plan whereby certain stations would be made central agencies . . ." and others abolished. The plan would necessarily result in loss of jobs for some of the station agents and telegraphers, members of the petitioner union. A few weeks after the state proceedings were filed and before any decision had been made, the petitioner union, the duly recognized, certified and acting collective bargaining agent for the railroad's employees, notified the railroad under § 6 of the Railway Labor Act, 45 U. S. C. § 156, that it wanted to negotiate with the railroad to amend the current bargaining agreement by adding the following rule:

> "No position in existence on December 3, 1957, will be abolished or discontinued except by agreement between the carrier and the organization."

The railroad took the position, according to its complaint, that this request did not constitute a "labor dispute under the Railway Labor Act," that it did not raise a bargainable issue, and that the union had no right to protest

or to seek relief except by appearing before the state public utility commissions which had power to determine whether station agencies could be discontinued, a power which private parties could not thwart by entering into a bargaining agreement. The respondent added that maintenance of the unnecessary agencies was offensive to the national transportation policy Congress adopted in the Interstate Commerce Act, 49 U. S. C. §§ 1–27, and that the duties that Act imposed on railroads could not be contracted away.

The union contended that the District Court was without jurisdiction to grant injunctive relief under the provisions of the Norris-LaGuardia Act because this case involved a labor dispute, and that the railroad had refused to negotiate in good faith on the proposed change in the agreement in violation of § 2, First, of the Railway Labor Act, 45 U. S. C. § 152, First, which requires the railroad to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions. Therefore, the union argued, an injunction in federal court is barred if for no other reason because of § 8 of the Norris-LaGuardia Act which provides:

> "No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." 29 U. S. C. § 108.

See *Brotherhood of Railroad Trainmen* v. *Toledo, P. & W. R. Co.*, 321 U. S. 50.

After hearings, the District Court found, so far as is relevant here, that the railroad "refused to negotiate, confer, mediate or otherwise treat with defendant Teleg-

raphers on the proposed change in agreement set forth in the Section 6 notice," although the railroad "did show willingness to negotiate upon the central agency plan, including a possibility concerning severance pay"; that the proposed contract change referred to in the § 6 notice "relates to the length or term of employment as well as stabilization of employment" and that collective bargaining as to the length or term of employment is commonplace; that "The dispute giving rise to the proposed strike is a major dispute and not a minor grievance under the Railway Labor Act, and no issue involved therein is properly referable to the National Railroad Adjustment Board"; [2] and that the contract change proposed in the § 6 notice related to "rates of pay, rules and working conditions," and was therefore a bargainable issue under the Railway Labor Act. On its findings and conclusions of law, the District Court granted temporary relief but declined to grant a permanent injunction on the ground that it was without jurisdiction to do so.

On appeal the Court of Appeals did grant a permanent injunction upon its decision that "The District Court's finding that the proposed contract change related to 'rates of pay, rules, or working conditions,' and was thus a bargainable issue under the Railway Labor Act, is clearly erroneous." [3] It held that the Norris-LaGuardia Act did not apply to bar an injunction against this strike [4] and

---

[2] See *Brotherhood of Railroad Trainmen* v. *Chicago River & I. R. Co.*, 353 U. S. 30.

[3] *Chicago & N. W. R. Co.* v. *Order of Railroad Telegraphers*, 264 F. 2d 254, at 260.

[4] *Ibid.* See *Brotherhood of Railroad Trainmen* v. *New York Central R. Co.*, 246 F. 2d 114. But see *Bull Steamship Co.* v. *Seafarers' International Union*, 250 F. 2d 326.

At the time of the District Court's decision, two States (South Dakota and Iowa) of the four in which the railroad had sought permission to institute its Central Agency Plan (the other two were Minnesota and Wisconsin) had granted permission and the plan was

we granted certiorari, 361 U. S. 809, to consider this important question.[5]

We hold, with the District Court, that this case involves or grows out of a labor dispute within the meaning of the Norris-LaGuardia Act and that the District Court was without jurisdiction permanently to enjoin the strike.

Section 4 of the Norris-LaGuardia Act specifically withdraws jurisdiction from a District Court to prohibit any person or persons from "[c]easing or refusing to perform any work or to remain in any relation of employment" "in any case involving or growing out of any labor dispute" as "herein defined."[6] Section 13 (c) of the Act defines a labor dispute as including,

> "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."[7]

Unless the literal language of this definition is to be ignored, it squarely covers this controversy. Congress made the definition broad because it wanted it to be broad. There are few pieces of legislation where the congressional hearings, committee reports, and the language in the legislation itself more clearly point to the necessity for giving an Act a construction that will protect the congressional policy the Act adopted. Section 2 of this Act specifies the public policy to be taken into

promptly placed in effect. Since then, we are given to understand, the commissions in the remaining two States have issued orders approving the plan.

[5] Compare *Marine Cooks & Stewards* v. *Panama Steamship Co.*, *post*, p. 365, decided this day.

[6] 29 U. S. C. § 104.

[7] 29 U. S. C. § 113 (c).

consideration in interpreting the Act's language and in determining the jurisdiction and authority of federal courts; it is one of freedom of association, organization, representation and negotiation on the part of workers.[8] The hearings and committee reports reveal that Congress attempted to write its bill in unmistakable language because it believed previous measures looking toward the same policy against nonjudicial intervention in labor disputes had been given unduly limited constructions by the courts.[9]

Plainly the controversy here relates to an effort on the part of the union to change the "terms" of an existing collective bargaining agreement. The change desired just as plainly referred to "conditions of employment" of the railroad's employees who are represented by the union. The employment of many of these station agents inescapably hangs on the number of railroad stations that will be either completely abandoned or consolidated with other stations. And, in the collective bargaining world today, there is nothing strange about agreements that affect the permanency of employment. The District Court's finding that "[c]ollective bargaining as to the length or term of employment is commonplace," is not challenged.

We cannot agree with the Court of Appeals that the union's effort to negotiate about the job security of its members "represents an attempt to usurp legitimate managerial prerogative in the exercise of business judgment with respect to the most economical and efficient conduct of its operations." [10] The Railway Labor Act

---

[8] 29 U. S. C. § 102.

[9] See *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797, 805; *United States* v. *Hutcheson,* 312 U. S. 219, 230–236; *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.,* 311 U. S. 91, 102–103.

[10] 264 F. 2d, at 259.

and the Interstate Commerce Act recognize that stable and fair terms and conditions of railroad employment are essential to a well-functioning national transportation system. The Railway Labor Act safeguards an opportunity for employees to obtain contracts through collective rather than individualistic bargaining. Where combinations and consolidations of railroads might adversely affect the interests of employees, Congress in the Interstate Commerce Act has expressly required that before approving such consolidations the Interstate Commerce Commission "shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." [11]  It requires the Commission to do this by including *"terms and conditions"* which provide that for a term of years after a consolidation employees shall not be "in a worse position with respect to their employment" than they would otherwise have been.[12]  (Emphasis supplied.)

In 1942 this Court held that when a railroad abandons a portion of its lines, the Interstate Commerce Commission has power to include conditions for the protection of displaced workers in deciding what "the public convenience and necessity may require." We so construed the Interstate Commerce Act specifically on the basis that imposition of such conditions "might strengthen the national system through their effect on the morale and stability of railway workers generally." *Interstate Commerce Comm'n* v. *Railway L. Exec. Assn.*, 315 U. S. 373, 378, citing *United States* v. *Lowden*, 308 U. S. 225. The brief for the railroad associations there called our attention to testimony previously given to Congress that as early as 1936 railroads representing 85% of the mileage of the country had made collective bargaining agreements

---

[11] 49 U. S. C. § 5 (2) (f).   And see § 5 (2) (c).

[12] 49 U. S. C. § 5 (2) (f).

338

with their employees to provide a schedule of benefits for workers who might be displaced or adversely affected by coordinations or mergers.[13]  In an effort to prevent a disruption and stoppage of interstate commerce, the trend of legislation affecting railroads and railroad employees has been to broaden, not narrow, the scope of subjects about which workers and railroads may or must negotiate and bargain collectively.  Furthermore, the whole idea of what is bargainable has been greatly affected by the practices and customs of the railroads and their employees themselves.  It is too late now to argue that employees can have no collective voice to influence railroads to act in a way that will preserve the interests of the employees as well as the interests of the railroad and the public at large.

The railroad has argued throughout the proceedings that the union's strike here may be enjoined, regardless of Norris-LaGuardia, because its effort to bargain about the consolidation and abandonment of railroad stations is unlawful.  It is true that in a series of cases where collective bargaining agents stepped outside their legal duties and violated the Act which called them into being, we held that they could be enjoined.[14]  None of these cases, however, enjoined conduct which the Norris-LaGuardia Act withdrew from the injunctive power of the federal courts except the *Chicago River* case which held

[13] Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 2531, 76th Cong., 1st Sess. 216–217.

[14] *Brotherhood of Railroad Trainmen* v. *Chicago River & I. R. Co.*, 353 U. S. 30; *Brotherhood of Railroad Trainmen* v. *Howard*, 343 U. S. 768; *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen*, 338 U. S. 232; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen*, 323 U. S. 210; *Virginian R. Co.* v. *System Federation No. 40*, 300 U. S. 515.  See also *Textile Workers Union* v. *Lincoln Mills*, 353 U. S. 448, 457–459.  And see *Steele* v. *Louisville & N. R. Co.*, 323 U. S. 192.

that a strike could be enjoined to prevent a plain violation of a basic command of the Railway Labor Act "adopted as a part of a pattern of labor legislation." 353 U. S. 30, 42. The Court there regarded as inapposite those cases in which it was held that the Norris-LaGuardia Act's ban on federal injunctions is not lifted because the conduct of the union is unlawful under some other, nonlabor statute.[15] Here, far from violating the Railway Labor Act, the union's effort to negotiate its controversy with the railroad was in obedience to the Act's command that employees as well as railroads exert every reasonable effort to settle all disputes "concerning rates of pay, rules, and working conditions." 45 U. S. C. § 152, First. Moreover, neither the respondent nor anyone else points to any other specific legal command that the union violated here by attempting to bring about a change in its collective bargaining agreement. It would stretch credulity too far

---

[15] The Court cited the following cases to show that unlawfulness under nonlabor legislation did not remove the restrictions of the Norris-LaGuardia Act upon the jurisdiction of federal courts: *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.,* 311 U. S. 91, 103 (alleged violations of Sherman Act); *East Texas Motor Freight Lines* v. *International Brotherhood of Teamsters,* 163 F. 2d 10, 12 (violation of Interstate Commerce Act and Motor Carrier Act).

Of course, a holding here that mere unlawfulness under any law is enough to remove the strictures of the Norris-LaGuardia Act would require a modification or abandonment of our statement that "For us to hold, in the face of this legislation [the Clayton and Norris-LaGuardia Acts], that the federal courts have jurisdiction to grant injunctions in cases growing out of labor disputes, merely because alleged violations of the Sherman Act are involved, would run counter to the plain mandate of the [Norris-LaGuardia] Act and would reverse the declared purpose of Congress." *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.,* 311 U. S. 91, 103. See also *Lee Way Motor Freight* v. *Keystone Freight Lines,* 126 F. 2d 931, 934.

to say that the Railway Labor Act, designed to protect railroad workers, was somehow violated by the union acting precisely in accordance with that Act's purpose to obtain stability and permanence in employment for workers. There is no express provision of law, and certainly we can infer none from the Interstate Commerce Act, making it unlawful for unions to want to discuss with railroads actions that may vitally and adversely affect the security, seniority and stability of railroad jobs.[16] And for a number of reasons the state public utility proceedings, invoked by the railroad to obtain approval of consolidation or abandonment of stations, could not stamp illegality on the union's effort to negotiate this whole question with the railroad. The union merely asked for a contractual right to bargain with the railroad about any voluntary steps it might take to abandon stations or to seek permission to abandon stations and thus abolish jobs. Nothing the union requested would require the railroad to violate any valid law or the valid order of any public agency. There is no testimony and there are no findings that this union has set itself up in defiance of any state mandatory order. In fact, there was no state order of any kind at the time the union first asked to negotiate about the proposed contractual change. Even if a Norris-LaGuardia "labor dispute" could not arise out

---

[16] Moreover, this railroad operates in nine States; it has instituted proceedings in the state regulatory commissions of four only and at the time of the District Court's decision, only two of these had rendered decisions. Yet the union's proposal was to negotiate for a clause which would apply to respondent's entire system. The railroad's refusal to bargain was not limited, however, to operations in the four States in which proceedings had begun. And even assuming that the order of one State, South Dakota, was mandatory and that this fact is of importance, it would not relieve the railroad from any duty it had to bargain on the proposed contract change in the eight other States involved.

of an unlawful bargaining demand, but see *Afran Transp. Co.* v. *National Maritime Union,* 169 F. Supp. 416, 1959 Am. Mar. Cas. 326, the union's proposal here was not unlawful.

The union contends that, whether the state rulings were mandatory or permissive, the States are without authority to order an abandonment of stations that would conflict with collective bargaining agreements made or to be made between the railroad and the union. Whether this contention is valid or not we need not decide since there is no such conflict before us. And the District Court expressly refused to find that the union's proposal was prompted by the railroad's action in seeking state authority to put its Central Agency Plan into effect. Instead, the District Court specifically found that the dispute grew out of the failure of the parties to reach an agreement on the contract change proposed by the union.

Only a word need be said about the railroad's contention that the dispute here with the union was a minor one relating to an interpretation of its contract and therefore one that the Railway Labor Act requires to be heard by the National Railroad Adjustment Board. We have held that a strike over a "minor dispute" may be enjoined in order to enforce compliance with the Railway Labor Act's requirement that minor disputes be heard by the Adjustment Board. *Brotherhood of Railroad Trainmen* v. *Chicago River & I. R. Co.,* 353 U. S. 30. But it is impossible to classify as a minor dispute this dispute relating to a major change, affecting jobs, in an existing collective bargaining agreement, rather than to mere infractions or interpretations of the provisions of that agreement. Particularly since the collective bargaining agreement which the union sought to change was a result of mediation under the Railway Labor Act, this is the type of major dispute that is not governed by the Adjustment Board.

In concluding that the injunction ordered by the Court of Appeals is forbidden by the Norris-LaGuardia Act, we have taken due account of the railroad's argument that the operation of unnecessary stations, services and lines is wasteful and thus runs counter to the congressional policy, expressed in the Interstate Commerce Act, to foster an efficient national railroad system. In other legislation, however, like the Railway Labor and Norris-LaGuardia Acts, Congress has acted on the assumption that collective bargaining by employees will also foster an efficient national railroad service. It passed such Acts with knowledge that collective bargaining might sometimes increase the expense of railroad operations because of increased wages and better working conditions. It goes without saying, therefore, that added railroad expenditures for employees cannot always be classified as "wasteful." It may be, as some people think, that Congress was unwise in curtailing the jurisdiction of federal courts in railroad disputes as it did in the Norris-LaGuardia Act. Arguments have even been presented here pointing to the financial debilitation of the respondent Chicago & North Western Railroad and to the absolute necessity for the abandonment of railroad stations. These arguments, however, are addressed to the wrong forum. If the scope of the Norris-LaGuardia Act is to be cut down in order to prevent "waste" by the railroads, Congress should be the body to do so. Such action is beyond the judicial province and we decline to take it.

There are other subsidiary questions raised with reference to the validity of a second 30-day restraining order issued by the district judge and an injunction pending appeal under Rule 62 (c) of the Federal Rules of Civil Procedure. But since we have determined the main controversy between the parties, we think it inadvisable to decide either of these questions now. We intimate no opinion concerning either at this time.

The judgment of the Court of Appeals is reversed and that of the District Court is affirmed insofar as it held that the court was without jurisdiction under the Norris-LaGuardia Act to enter the injunction.

*It is so ordered.*

Mr. Justice Clark, dissenting.

The respondent, suffering from financial headaches, conducted an efficiency survey of its operations. This indicated that it was carrying considerable dead weight on its payroll in the form of local, one-man stations. Some of its local agents worked as little as 12 minutes a day and the average daily work time on its one-man stations was only 59 minutes. All drew a full day's pay. In fact, the pay for time worked, it was found, ran in some cases as high as $300 per hour. Meanwhile the railroad was facing a slow death for lack of funds—all to the ultimate but certain detriment of the public, the employees and the management. It then proposed—and, after hearings, four States approved—a consolidation of work so that an agent would have sufficient duties to perform to earn a full day's pay. This would also permit the railroad, without any curtailment of its service to the public, to reduce its employee force over its entire system by several hundred agents. It proposed to negotiate with the union as to the severance pay and other perquisites for those agents whose services would no longer be needed. This the union refused to do, demanding that before any agent's position be abolished the railroad obtain its consent. The union offered but one alternative: "comply with" its demand, or suffer a "strike." The railroad, in the face of such a ukase, brought this suit.

Today the Court tells the railroad that it must bargain with the union or suffer a strike. The latter would be

the death knell of the railroad. Hence, for all practical purposes, the Court is telling the railroad that it must secure the union's approval before severing the hundreds of surplus employees now carried on its payroll. Everyone knows what the answer of the union will be. It is like the suitor who, when seeking the hand of a young lady, was told by her to "go to father." But, as the parody goes, "She knew that he knew that her father was dead; she knew that he knew what a life he had led; and she knew that he knew what she meant when she said 'go to father.'"

I do not believe that the Congress intended to put the railroads in such a situation. In fact, its over-all purpose has been to prevent the devastating effects of strikes from paralyzing our transportation systems, the efficient operation of which is so vital to the public welfare. As I read the Interstate Commerce Act—the provisions of which were reaffirmed as late as the Transportation Act of 1958—the Congress told the railroads to go to the States— not the union—before abandoning or consolidating its local stations. Respondent went to the States and obtained their approval. The Court today gives to the union a veto power over this action of the States. Until this power is removed, the railroads will continue to be plagued with this situation—so foreign to the concept of a fair day's pay for a fair day's work, which has been the basis of union labor's great achievements.

For this reason, as well as those so ably enumerated by my Brother WHITTAKER in his dissent, which I join, I am obliged to disagree with the Court. Perhaps the Congress will be obliged, in the face of this ruling, to place the solution of such problems within the specific power of the Interstate Commerce Commission or under the Railway Labor Act, each of which, as well as the courts, is today held impotent.

MR. JUSTICE WHITTAKER, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE CLARK and MR. JUSTICE STEWART join, dissenting.

The Court concludes, as I read its opinion, that the Union's demand for a covenant that no existing position may be abolished without its consent was a lawfully bargainable one under the Railway Labor Act; that the Union did not, by its demand, attempt unlawfully to "set itself up in defiance of" public regulatory orders; that the "union merely asked for a contractual right to bargain with the railroad about . . . abandon[ing] stations . . . and thus abolish[ing] jobs"; that "[e]ven if a Norris-LaGuardia 'labor dispute' could not arise out of an unlawful bargaining demand . . . the union's proposal here was not unlawful," and that the Norris-LaGuardia Act deprived the court of jurisdiction to enjoin the threatened strike to enforce acceptance of the Union's demand.

With all deference, I believe that these conclusions are contrary to the admitted or indubitable facts in the record, to the provisions and policies of Acts adopted by Congress, and also to principles established by many decisions of this Court; and being fearful that the innovation and reach of the Court's conclusions will be destructive of congressional policy and injurious to the public interest, I feel compelled to state my dissenting views.

Inasmuch as I read the record somewhat differently than does the Court, my first effort will be to make a plain and chronological statement of the relevant facts.

The Chicago and North Western Railway Company ("North Western") is a major interstate common carrier by railroad. The Order of Railroad Telegraphers ("Union") is a railway labor union, certified by the National Mediation Board as the representative of the

station agents and various other employees of North Western. North Western's lines extend westerly and northerly from Chicago into and serve nine largely agricultural Midwestern States. They were laid out and constructed near the middle of the last century, and, to accommodate that day's mode and conditions of rural travel, stations were established at close intervals along its lines—one every seven to 10 miles along its branch lines through rural sections—to enable its patrons to travel, by horse or horses and wagon over dirt roads, from their homes to the station and return in one day.

Although originally an efficient and profitable railroad, North Western, in more recent years, failed both to maintain and to modernize its lines, facilities and equipment, and also permitted many outmoded, inefficient and wasteful practices to continue—producing the highest ratio of wage and salary expense to the revenue dollar of all major American railroads—resulting ultimately in its inability effectively to compete with new forms of transportation, or even with modernized railroads. In consequence, its net revenues so steadily and extensively declined that it lost $8,000,000 in the first quarter of 1956, and this so reduced its cash position that its payrolls of $330,000 per day to its 18,000 employees were in jeopardy.

Alarmed by these conditions, North Western's new managers undertook a number of steps in the spring of 1956 to improve its physical condition and competitive position, including the elimination of many outmoded, costly and wasteful practices. It then had several hundred "one-man" stations, principally located on branch lines from which—due to lack of need, occasioned by the advent of paved roads and motorized vehicles—all passenger trains and many freight trains had been removed and over which the few remaining freight trains passed at hours when many of the agents were not even on

duty.[1]  Its studies disclosed many instances where such agents were drawing a full day's pay for as little as 15 to 30 minutes' work.  Conceiving this to be a wasteful practice and violative of the national transportation policy,[2] North Western promulgated a plan—known as its Central Agency Plan—which contemplated the discontinuance of a full-time agent at most of such stations and provided, instead, for a centrally located agent to perform the necessary agency services at the central station and also at the neighboring station or stations to either side.

Accordingly, North Western filed petitions with the Public Utility Commissions of South Dakota, Iowa, Minnesota and Wisconsin to effectuate its Central Agency Plan.  The first of those petitions was filed with the South Dakota Commission on November 5, 1957, asking authority to effectuate the Central Agency Plan with respect to 69 "one-man" stations in that State.  Hearings were held by that Commission beginning November 26, 1957, and ending January 17, 1958.  The Union appeared in that proceeding, presented evidence, a brief and an oral argument, in opposition to the petition.  It contended, among other things, that its existing bargaining agreement with North Western prohibited abolishment of any agency jobs without its consent.  On May 9, 1958,

---

[1] The fact that many of these agents were not on duty when the freight trains passed their stations was due to a union requirement that their day's work must begin at 8:30 a. m.

[2] Act of Sept. 18, 1940, c. 722, Title I, § 1, 54 Stat. 899—preceding Part I of the Interstate Commerce Act, 49 U. S. C. § 1—titled "National Transportation Policy."  In pertinent part, it provides: "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act . . . to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers . . . ."

the Commission entered its order. It found that the workload of the agents at the stations involved varied from 12 minutes to 2 hours per day and averaged 59 minutes per day. It further found:

> "That the maintenance of full-time agency service at all of the subject stations, because of the lack of public need constitutes mismanagement and a dissipation of carrier's revenues which has and will impair its capacity to render adequate rail service to the public at reasonable rates . . . ."[3]

Thereupon, the Commission, electing to act under a South Dakota statute authorizing it to *order* changes to be made in station operations where necessary in the public interest, *directed* North Western to make the plan (establishing 16 central agency stations and abolishing 53 full-time agency positions) effective immediately.

---

[3] The South Dakota Commission further found that the expenses of operating the 69 stations involved exceeded related revenues by $170,399 in 1956, and that if the Central Agency Plan had been in effect during that period there would have been a surplus of $58,884.

Hearings were afterwards conducted upon the similar petitions before the Iowa, Minnesota and Wisconsin Commissions. The Union appeared in each of those proceedings and presented evidence, briefs and arguments in opposition to the petitions, but each was granted.

The Iowa Commission found that the agents at the stations there involved worked an average of 1 hour and 14 minutes per day, a decrease of 28% since 1951, and that the estimated average workload under the Central Agency Plan would be 3 hours and 15 minutes per day. It said, *inter alia*, "Savings must be made by reducing or eliminating service no longer needed. The case before us is a proposal to reduce agency service to the level of actual need." And it found that such was necessary "to insure efficiency, economy and adequate rail transportation."

The Union appealed from the orders of the respective Commissions to the courts of the respective States, but the Commission action was affirmed in each instance.

On December 23, 1957, about six weeks after North Western filed its petition with the South Dakota Commission, the Union, purporting to act under the provisions of § 6 of the Railway Labor Act,[4] sent a letter to North Western requesting that their bargaining agreement be amended by adding the following provision:

"No position in existence on December 3, 1957, will be abolished or discontinued except by agreement between the carrier and the Organization."

North Western responded the next day, saying that it did not consider the request to be a proper subject of bargaining,[5] but it offered, without waiving its position, to meet with the Union's officers and to discuss the matter further. Conferences were thereafter held by the parties but no agreement was reached, and the Union invoked mediation under the Railway Labor Act. On February 24, 1958, the National Mediation Board began its efforts to mediate the controversy, and its representative conducted a number of meetings between the parties to that end,[6] but was not successful, and thereafter the

---

[4] 48 Stat. 1197, 45 U. S. C. § 156.

[5] North Western's reply stated, *inter alia*, that, in its view, the Union's request was "not a proper subject for a Section 6 notice in that it does not in fact concern rules, rates of pay or working conditions, but instead constitutes an attempt to freeze assignments regardless of the controlling agreement and regardless of the necessity or justification for such assignments."

[6] In the mediation meetings and other meetings between the parties, North Western suggested several means of cushioning the effects of discontinuing these "one-man" agency jobs, including (1) the transfer of the agents affected to productive jobs; (2) the limiting of job abolishments to an agreed number per year; and (3) the payment of supplemental unemployment benefits to the employees affected. The Union refused to discuss these proposals.

At a meeting between North Western's chief executive officer and the Union's president and its general counsel at Madison, Wisconsin, during the period of the mediation efforts, North Western's official

Board, acting pursuant to § 5, First, of the Railway Labor Act,[7] wrote the parties on May 27, requesting them to submit the controversy to arbitration under the provisions of § 8 of the Railway Labor Act.[8] But both parties declined—the Union on May 28 and North Western on June 12—and, on June 16, the Board terminated its services and so advised the parties in writing.

On July 10, the Union sent to its members a strike ballot under an accompanying letter.[9] The vote was almost unanimous in favor of a strike, and, on August 18, the Union called a strike of its members to begin at 6 a. m. on August 21.[10] A renewed proffer of

---

asked if there was any "possibility" of "working out these station closing matters and the discontinuance of the positions of these station agents" either on a South Dakota or a system basis. The Union's president asked his general counsel for his views on the matter. The latter replied "I think we are too far apart," and North Western's official then said "I want you to know that my door is always open."

The Union's president testified at the subsequent District Court trial that ". . . the only alternative which up to the present I have offered the North Western Railroad was to comply with this rule or strike."

[7] 45 U. S. C. § 155, First.

[8] 45 U. S. C. § 158.

[9] The Union's letter of July 10, 1958, after referring to the efforts of North Western to abolish many of the "one-man" agency jobs and to the Union's efforts in opposition, stated among other things:

"However, it became evident at an early date that to meet this onslaught effectively would require strengthening of our Agreements. . . . We must prevent a continuance of such a program.

"While we hope the commissions in other states will be more reasonable than the South Dakota Commission, we have no assurance that we will not soon see a repetition in other states of what has happened in South Dakota. . . ."

[10] The strike call, after referring to the Union's efforts to prevent the abolishment of jobs at "one-man" stations said, *inter alia,* that: "The need for the proposed rule has again been tragically demonstrated in the last few days. What happened in South Dakota was repeated in Iowa, except that this time 70 positions were abolished and 27 assignments enlarged."

mediation services by the Board was accepted by the parties and, through it, further efforts were made on August 19 to compose the controversy, but without success, and, on August 20, the Board again advised the parties that it had terminated its services.

On August 20, North Western filed a complaint against the Union and various of its officials in the United States District Court for the Northern District of Illinois, alleging that the Union's contract demand was not a lawfully bargainable subject under the Railway Labor Act; that the impending strike, called to force acceptance of that demand by North Western, would be illegal; that North Western had a right arising under the laws of the United States, particularly the Interstate Commerce Act and the Railway Labor Act, to be free of such an illegal strike, and it prayed that it be enjoined. The court entered a temporary restraining order on that date. Thereafter, following full hearing, the court held that the Union's demand "relates to 'rates of pay, rules and working conditions' and is a bargainable issue under the Railway Labor Act"; that a strike to force acceptance of that demand would not be unlawful; and, on September 8, 1958, the court entered its decree restraining the strike until midnight, September 19, denying any further injunctive relief,[11] and dismissing the complaint. The Court of Appeals, holding that the Union's contract demand was not a lawfully bargainable one and that its acceptance could not legally be forced by a strike, reversed and remanded with directions to enter an injunction as prayed in the complaint. 264 F. 2d 254. This Court granted certiorari, 361 U. S. 809, and now reverses the judgment of the Court of Appeals upon grounds which, with deference, I think are not only injurious to the public interest

---

[11] By order of Sept. 16, 1958, the District Court further restrained the impending strike pending determination of North Western's appeal.

352

but also demonstrably legally erroneous, as I shall endeavor to show.

Congress, in comprehensively providing for the regulation of railroads, their transportation services and their employer-employee relations, has declared its policies in several related Acts, including Part 1 of the Interstate Commerce Act,[12] the Railway Labor Act,[13] and the Norris-LaGuardia Act,[14] and, at least in cases such as this, none of them may meaningfully be read in isolation but only together as, for they are in fact, an integrated plan of railroad regulation. And if, as is frequently the case in such undertakings, there be overlappings, "[w]e must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other." *Allen Bradley Co.* v. *Local Union*, 325 U. S. 797, 806.

By Part I of the Interstate Commerce Act, Congress has provided a pervasive scheme of regulation of all common carriers engaged in transportation by railroad in interstate commerce. The declared policy of that Act was to promote economical and efficient transportation services at reasonable charges[15] and, as this Court has said, "It is a primary aim of that policy to secure the avoidance of waste. That avoidance, as well as the maintenance of service, is viewed as a direct concern of the public." *Texas* v. *United States*, 292 U. S. 522, 530. "Congress has long made the maintenance and development of an economical and efficient railroad system a matter of primary national concern. Its legislation must be read with this purpose in mind." *Seaboard R. Co.* v. *Daniel*, 333 U. S. 118, 124–125.

---

[12] 49 U. S. C. §§ 1–27.

[13] 45 U. S. C. §§ 151–164.

[14] 29 U. S. C. §§ 101–115.

[15] See note 2 for the pertinent provisions of the National Transportation Policy.

To aid in effectuating that policy, Congress has contemplated the abandonment of railroad lines, stations, depots and other facilities and services when found by designated public regulatory bodies to be burdensome and no longer required to serve the public convenience and necessity. To this end, it has empowered the Interstate Commerce Commission, upon application and after notice and public hearing, to issue a certificate authorizing the abandonment of "all or any portion of a line of railroad," and it has provided that "[f]rom and after issuance of such certificate . . . the carrier by railroad may, *without securing approval other than such certificate . . . proceed with the . . . abandonment covered thereby.*" [16] (Emphasis added.) And in the Transportation Act of 1958 (72 Stat. 568), Congress has empowered the Commission, under stated conditions, to authorize the abandonment of "any train or ferry." [17] However, Congress has not sought completely to accomplish its abandonment policies through the Commission. Rather, it has sought to make use of state regulatory commissions, as additional instruments for the effectuation of its policies, in respect to the abandonment of some railroad facilities and services. Among others, it has long left to state regulatory commissions abandonments of railroad stations and station agency service; and, in 1958, after extensive review of that subject in the process of enacting the Transportation Act of 1958, it deliberately reaffirmed that policy.[18]

---

[16] 49 U. S. C. §§ 1 (18), 1 (19), 1 (20).

[17] Act of Aug. 12, 1958, Pub. L. 85–625, § 5, 72 Stat. 571, 49 U. S. C. § 13a.

[18] The Transportation Act of 1958, 72 Stat. 568. See Hearings Before Subcommittee on Surface Transportation of Senate Committee on Interstate and Foreign Commerce on Problems of the Railroads, 85th Cong., 2d Sess., pp. 1816, 1817, 1821, 2027, 2028; 104 Cong. Rec., pp. 10850, 12522, 12537, 15528; S. Rep. No. 1647 on S. 3778, 85th Cong., 2d Sess.; H. R. Rep. No. 1922 on H. R. 12832, 85th Cong., 2d Sess.; H. R. Conf. Rep. No. 2274, 85th Cong., 2d Sess.

Moreover, in its report on S. 3778, which culminated in the Transportation Act of 1958, the Senate Committee on Interstate and Foreign Commerce critically attributed a major part of the financial plight of the railroads to their failure to apply to regulatory bodies for permission to abandon burdensome and needless services in accordance with congressional policy, and strongly advocated that such be done.[19]

For the fair and firm effectuation of these policies, Congress has provided that issues respecting the propriety of an abandonment shall be determined by a public regulatory body. It has contemplated that the carrier shall propose to the proper regulatory body the abandonment of particular facilities or services and that, after notice and hearing—at which all persons affected, including employees and their union representatives, may appear and be heard—the public regulatory body shall determine whether the proposal is in the public interest, and its order, unless reversed on judicial review, shall be binding upon all persons. These procedures plainly exclude any right or power of a carrier, at its will alone, to effectuate, or of a labor union representing its employees

---

[19] "The railroad industry has not, in the subcommittee's opinion, been sufficiently interested in self-help in such matters as consolidations and mergers of railroads; joint use of facilities in order to eliminate waste, such as multiple terminals and yards that require expensive interchange operations; reduction of duplications in freight and passenger services by pooling and joint operations; abandonment or consolidation of nonpaying branch and secondary lines; abolishing of unnecessarily circuitous routes for freight movements; improved handling of less-than-carload traffic; coordination of transportation services and facilities by establishment of through routes and joint rates with other forms of transportation; and modernization of the freight-rate structure, including revision of below-cost freight rates to levels that cover cost and yield some margin of profit as well as adjustment of rates excessively above cost to attract traffic and yield more revenue." S. Rep. No. 1647, 85th Cong., 2d Sess., p. 11.

to veto, any proposed abandonment. Although both may be heard, neither of them, nor the two in agreement, even if their agreement be evidenced by an express contract, may usurp the Commission's decisional function by dictating the result or thwarting its effect. It is obvious that any abandonment, authorized by a proper regulatory body, will result in abolishment of the jobs that were involved in the abandoned service. And inasmuch as the maintenance of these jobs constituted at least a part of the wasteful burden that necessitated the abandonment, it is equally obvious that Congress intended their abolishment. Yet, here, the Union has demanded, and threatens to force by a strike, acceptance by the carrier of a covenant that no job in existence on December 3, 1957, will be abolished without its consent. Certainly that demand runs in the teeth of the recited provisions and policies of the Interstate Commerce Act. It plainly would destroy the public regulation of abandonments, provided and contemplated by Congress in the public interest, and render them subject to the Union's will alone. A demand for such a contractual power surely is an unlawful demand.

The Union argues, and the Court seems to find, that there is a basis for the claimed legality of the Union's demand in the provision of § 5 (2)(f) of the Interstate Commerce Act [20] that the Commission in approving railroad mergers or consolidations "shall require a fair and equitable arrangement to protect the interests of the railroad employees affected." Instead of supporting legality of the Union's demand, I think the provisions of that section and its legislative history are further proof of its illegality. While that section authorizes the Commission to require temporary mitigation of hardships to employees displaced by such unifications, nothing in it authorizes the Commission to freeze existing jobs. However, in the

---

[20] 49 U. S. C. § 5 (2)(f).

course of its enactment an effort was made to amend it to that end. On the floor of the House, Representative Harrington advocated the following proviso:

> "*Provided, however,* That no such transaction shall be approved by the Commission if such transaction will result in unemployment *or displacement of employees of the carrier* or carriers, or in the impairment of existing employment rights of said employees." [21]    (Emphasis added.)

While the bill was in Conference, the Legislative Committee of the Interstate Commerce Commission sent a communication to Congress condemning the principle of the Harrington amendment in the following words:

> "As for the [Harrington] proviso, *the object of unifications is to save expense, usually by the saving of labor.* Employees who may be displaced should, in the case of railroad unifications, be protected by some such plan as is embodied in the so-called 'Washington agreement' of 1936 between the railroad managements and labor organizations [providing for the mitigation of hardships by the payment of certain monetary benefits for a limited period to employees whose jobs are abolished by such approved unifications]. *The proviso, by prohibiting any displacement of employees, goes much too far,* and in the long run will do more harm than good to the employees." [22]    (Emphasis added.)

Congress rejected the Harrington proviso in the form proposed. Yet, the Union's demand here is designed to accomplish the very purpose that Congress rejected. Of the Harrington proviso this Court said in *Railway Labor*

---

[21] 84 Cong. Rec. (1939), Pt. 9, p. 9882.

[22] Interstate Commerce Commission Report on S. 2009, Omnibus Transportation Legislation, p. 67 (76th Cong., 3d Sess., House Committee Print), transmitted Jan. 29, 1940.

*Executives' Assn.* v. *United States,* 339 U. S. 142, that it "threatened to prevent all consolidations to which it related [but Congress] . . . made it workable by putting a time limit upon its otherwise prohibitory effect." 339 U. S., at 151, 153. But Congress actually did more. It eliminated any power to freeze existing jobs. It is not to be doubted that a carrier and a labor union representing the carrier's employees, lawfully may bargain about and agree upon matters in mitigation of hardships to employees who are displaced by railroad unifications or abandonments; but they may not agree, nor may any regulatory body order, that no jobs shall be abolished, and thus defeat unifications or abandonments required in the public interest. *Railway Labor Executives' Assn.* v. *United States, supra; Interstate Commerce Comm'n* v. *Railway Labor Executives' Assn.,* 315 U. S. 373; *United States* v. *Lowden,* 308 U. S. 225.

There is no dispute in the record that the carrier sought to bargain and agree with the Union upon matters in mitigation of hardships to employees displaced by the station abandonments. It offered to bargain about (1) transferring the agents affected to productive jobs, (2) limiting the job abolishments to an agreed number per year, and (3) paying supplemental unemployment benefits to the employees affected.[23]  Short of foregoing the station abandonments, this is all it lawfully could do. It is not suggested that it should have done more in this respect.  Indeed, the Union refused even to discuss these proposals.[24]  Instead, as its president testified at the trial, the only "alternative" the Union "offered the North Western Railroad was to comply with this rule or strike." [25]

This also answers the Court's argument that there is nothing in the Interstate Commerce Act "making it unlawful for unions to want to discuss with railroads

---

[23] See note 6.          [24] *Ibid.*          [25] *Ibid.*

actions that may vitally and adversely affect the security, seniority and stability of railroad jobs." The quoted statement is literally true. But the further truth is that the carrier offered to bargain and agree with the Union about those matters, but the Union refused even to discuss them. Note 6, *ante*. The Union's demand was not for a right "to discuss" such matters with the carrier, but was, rather, that the carrier agree that no jobs in existence on December 3, 1957, be abolished without the Union's consent. And the only "alternative" it offered was: "comply with this rule or strike." *Ibid.* The foregoing likewise answers the Court's argument that the Union "merely asked for a contractual right to bargain with the railroad about any voluntary steps it might take to abandon stations . . . and thus abolish jobs." Plainly the Union's demand was not for a right "to bargain with" the carrier about "abolish[ing] jobs," but was for a unilateral right to prohibit the abolishment of any job without its consent.

The Court fails to find any testimony in the record "that this union has set itself up in defiance of any state mandatory order." Although, in my view, the question is not whether it has set itself up in defiance of any valid existing state mandatory order, but rather is whether it lawfully may demand, and force by a strike, acceptance of a covenant in derogation of the law; yet, in very truth, it "has set itself up in defiance," or, at least, in derogation, of a "state mandatory order." As earlier noted, the order of the South Dakota Commission—the validity of which cannot be questioned here—was a mandatory one. It *directed* the carrier to make the Central Agency Plan effective in that State and, thereunder, forthwith to abolish 53 full-time agency jobs. That order was entered on May 9, 1958, and if the Union's demand, that no job in existence on December 3, 1957, may be abolished without its consent, is a lawful one and may be enforced by a strike, then the South Dakota order is not only defied

but defied successfully. Moreover, while such orders of state commissions, like those of the Interstate Commerce Commission, are in the nature of things usually permissive in character, they are nevertheless binding administrative determinations made, as Congress contemplated and Mr. Justice Brandeis said, "to protect interstate commerce from undue burdens," *Colorado* v. *United States,* 271 U. S. 153, 162, and may not be overridden or thwarted by private veto.

Section 2, First, of the Railway Labor Act makes it the duty of carriers and their employees to exert every reasonable effort "to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise." [26]   Here, the Union's demand was simply for a covenant that no existing jobs may be abolished without its consent. It thus seems plain that the demand did not relate to the "rates" of compensation to be paid to employees nor to their "working conditions," but, rather, it related solely to whether the employment relation, as to any existing job, might be severed altogether. It, therefore, seems clear enough that the demanded covenant was, in terms, beyond the purview of § 2, First. But even if this conclusion may be doubted, surely it must be agreed that Congress did not contemplate that agreements might be made, under the aegis of that section, in derogation of the commands, policies and purposes of related Acts which it has promulgated for the regulation of carriers and their employer-employee relations in the public interest. Here, as has been shown, the Union's demand was in derogation of the provisions and policies of the Interstate Commerce Act. It could not therefore be a lawfully bargainable subject within the purview of § 2, First, of the Railway Labor Act.

---

[26] 45 U. S. C. § 152, First.

The carrier could not lawfully accept it,[27] and hence a strike to force its acceptance would be one to force a violation of the law.

Surely, in such circumstances, the carrier, in discharging its duty to safeguard the public interest,[28] has a legal right to be free of a strike to force it to accept a demand which Congress has made unlawful. But there is no administrative remedy in such a case, and, hence, the legal right will be sacrificed, and Congress' policies will be thwarted, unless a preventive judicial remedy is available. Certainly Congress did not intend to create and "to hold out to [the carrier and the public] an illusory right for which it was denying them a remedy." *Graham* v. *Brotherhood of Firemen*, 338 U. S. 232, 240.

Nor does the Norris-LaGuardia Act render federal courts impotent to enjoin unlawful conduct or strikes to force acceptance of unlawful demands. That Act, in terms, permits federal courts to enjoin "unlawful acts [that] have been threatened and will be committed unless restrained." [29] This Court has consistently held that the Norris-LaGuardia Act does not prevent a federal court from enjoining an unlawful abuse of power conferred upon a labor union by the Railway Labor Act or a threatened strike to force acceptance of an unlawful demand.

In *Brotherhood of Railroad Trainmen* v. *Chicago River & Indiana R. Co.*, 353 U. S. 30, a union threatened a strike to force a carrier to accept demands which Congress had placed within the exclusive jurisdiction of the Railroad Adjustment Board. Holding that the demands were in

---

[27] *Brotherhood of Railroad Trainmen* v. *Howard*, 343 U. S. 768.

[28] *Virginian Railway Co.* v. *System Federation No. 40*, 300 U. S. 515. "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." 300 U. S., at 552.

[29] 29 U. S. C. § 107 (a).

derogation of that Act of Congress and therefore illegal, a federal court enjoined the threatened strike to enforce them. The union contended here that the Court was without jurisdiction to issue the injunction because "the Norris-LaGuardia Act has withdrawn the power of federal courts to issue injunctions in labor disputes [and that the] limitation . . . applies with full force to all railway labor disputes." 353 U. S., at 39–40. In rejecting that contention, this Court said:

> "We hold that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable." 353 U. S., at 40.

And finding that the union's demands violated the provisions of the Railway Labor Act, this Court held "that the specific provisions of the Railway Labor Act take precedence over the more general provisions of the Norris-LaGuardia Act," and, reaffirming its decision in *Brotherhood of Railroad Trainmen* v. *Howard,* 343 U. S. 768, it further held " 'that the District Court [had] jurisdiction and power [to enjoin the threatened strike] notwithstanding the provisions of the Norris-LaGuardia Act.' " 353 U. S., at 41–42.

There, as here, the union's demand was in derogation of the specific provisions of an Act of Congress, and here, as there, those specific provisions must "take precedence over the more general provisions of the Norris-LaGuardia Act."

In *Virginian Railway Co.* v. *System Federation No. 40,* 300 U. S. 515, this Court held that a federal court could lawfully issue an injunction in a labor dispute that was governed by the specific provisions of a federal statute,

and that "[s]uch provisions cannot be rendered nugatory by the earlier and more general provisions of the Norris-LaGuardia Act." 300 U. S., at 563.

*Steele* v. *Louisville & Nashville R. Co.*, 323 U. S. 192, involved the unlawful misuse by a union of the powers conferred upon it by the Railway Labor Act. Observing that "there is no mode of enforcement [of the rights that were being denied by such misuse of powers] other than resort to the courts," this Court held that a federal court had the "jurisdiction and duty to afford a remedy for a breach of statutory [rights]." 323 U. S., at 207. On almost identical facts, this Court reaffirmed that principle in *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U. S. 210. In a similar factual situation, this Court held in *Graham* v. *Brotherhood of Locomotive Firemen & Enginemen,* 338 U. S. 232, that a federal court may enjoin a labor union from unlawfully using or abusing powers conferred upon it by the Railway Labor Act, notwithstanding the Norris-LaGuardia Act. And, after reviewing the then-existing cases, the Court concluded:

> "If, in spite of the *Virginian, Steele,* and *Tunstall* cases, *supra,* there remains any illusion that under the Norris-LaGuardia Act the federal courts are powerless to enforce these rights, we dispel it now." 338 U. S., at 240.

*Brotherhood of Railroad Trainmen* v. *Howard,* 343 U. S. 768, was an action to enjoin a union and a carrier from enforcing the provisions of a contract, made under the threat of a strike, that unlawfully deprived a class of railroad employees of legal rights which this Court held had been impliedly vouchsafed to them by the Railway Labor Act. Finding that the questioned provisions of that contract were "unlawful" and that the injured persons "must look to a judicial remedy to prevent the sacrifice or obliteration of their rights under the [Railway Labor] Act [inasmuch as] no adequate administrative

remedy can be afforded by the National Railroad Adjustment or Mediation Board[s]," this Court concluded "that the District Court has jurisdiction and power to issue necessary injunctive orders notwithstanding the provisions of the Norris-LaGuardia Act. We need add nothing to what was said about inapplicability of that Act in the *Steele* case and in *Graham* v. *Brotherhood of Firemen*, 338 U. S. 232, 239–240." 343 U. S., at 774.

Resting upon its conclusion that the Union's demand here was a lawful one, the Court relegates the *Virginian, Steele, Tunstall, Graham* and *Howard* cases to a footnote, and says, "None of these cases, however, enjoined conduct which the Norris-LaGuardia Act withdrew from the injunctive power of the federal courts." Does the Court mean by this statement that, although it enjoined enforcement of the illegal provisions of the contract which had been forced upon the carrier by "the threat of a strike" in the *Howard* case, it would not, if asked, have enjoined the strike which forced acceptance by the carrier of that unlawful contract? At all events, it cannot be denied, and the Court concedes, that the *Chicago River* case holds that a threatened strike to force compliance with unlawful demands may be enjoined. There, just as here, a threatened strike was enjoined. There, as here, the injunction issued because the Union's demand was not a lawfully bargainable one under the Railway Labor Act. The demands in the *Chicago River* case were unlawful because jurisdiction over their subject matter had been exclusively vested by Congress in the Railroad Adjustment Board, while in this case the demand is unlawful because jurisdiction over its subject matter has been exclusively vested partly in the Interstate Commerce Commission and partly in state regulatory commissions. Today's attempted distinctions of that case were advanced in that case, but were found "inapposite," 353 U. S., at 42. Being "inapposite" there, they are so here. I submit that, on the point in

issue, the *Chicago River* case is indistinguishable from this one, and that if the Norris-LaGuardia Act did not prohibit a federal court from issuing an injunction in that case, it does not do so in this one.

It is to be noted that the Court does not say that the Norris-LaGuardia Act prohibits federal courts from enjoining threatened strikes to force acceptance of illegal demands. It says, rather, that "Even if a Norris-LaGuardia 'labor dispute' could not arise out of an unlawful bargaining demand . . . the union's proposal here was not unlawful." If it fairly may be inferred from that statement that the Court would have sustained jurisdiction had it found the demand to be unlawful, then my disagreement with the Court would be reduced to and turn on that simple issue. And as to it, I respectfully submit that the admitted facts show that the demand was in derogation of the provisions and policies of the Interstate Commerce Act. Believing that the demand was not a lawfully bargainable one under the Railway Labor Act, and that the District Court had jurisdiction to enjoin the threatened strike, called to force acceptance of that illegal demand, I would affirm the judgment of the Court of Appeals.

Memorandum of MR. JUSTICE STEWART.

I have strong doubt as to the existence of federal jurisdiction in this case, for reasons well expressed by then Circuit Judge Minton, dissenting in *Toledo, P. & W. R. Co.* v. *Brotherhood of Railroad Trainmen,* 132 F. 2d 265, 272–274. See *Brotherhood of Railroad Trainmen* v. *New York Central R. Co.,* 246 F. 2d 114, at 122 (dissenting opinion). If, however, the Federal District Court had jurisdiction, as all my Brethren seem to believe or at least assume, MR. JUSTICE WHITTAKER's dissenting opinion convincingly demonstrates for me that the District Court had power to issue an injunction.