AFRAN TRANSPORT COMPANY, Calendar Navigation Corp., California Transport Corporation, Carib Marine Company, Grand Bassa Tankers, Inc., Hemisphere Transportation Corporation, Kupan Transport Company, Mobil Tankers Company, S.A., Norness Shipping Company, Inc., Panama Transport Company, Seatankers, Inc., Tanker Transport, Inc., Theater Navigation Corp., Trans-Atlantic Navigation Corporation and Universe Tankships, Inc., Plaintiffs,

**v.**

NATIONAL MARITIME UNION, an unincorporated association; Seafarers International Union of North America, an unincorporated association; Joseph Curran, individually and as an officer and member representative of all the members of the National Maritime Union; and Joseph Algina, individually and as an officer and member representative of all the members of the Seafarers International Union of North America, Defendants.

United States District Court
S. D. New York.

Dec. 19, 1958.

Maclay, Morgan & Williams, New York City, C. Dickerman Williams, Hugh S. Williamson, Granville Whittlesey, New York City, of counsel, for plaintiffs.

Cooper, Ostrin & De Varco, New York City, Herman E. Cooper, H. Howard Ostrin, George A. Nicolau, Eugene N. Sos

**418**

noff, New York City, of counsel, for defendants, National Maritime Union and Joseph Curran.

Seymour W. Miller, Brooklyn, N. Y., William Feldesman, Milton Horowitz, New York City, Ralph P. Katz, Brooklyn, N. Y., of counsel, for defendants, Seafarers International Union of North America, AFL–CIO and Joseph Algina.

Bigham, Englar, Jones & Houston, New York City, Leonard J. Matteson, J. Bond Smith, Jr., New York City, of counsel, for Republic of Panama, amici curiæ.

Burlingham, Hupper & Kennedy, New York City, for Republic of Liberia, amici curiæ.

FREDERICK van PELT BRYAN, District Judge.

Plaintiffs here are twelve Liberian corporations and three Panamanian corporations who operate some 128 vessels under Liberian or Panamanian flags and registry, transporting oil and other bulk cargoes from foreign to United States ports.

Defendants National Maritime Union (NMU) and Seafarers International Union of North America (SIU) are both international unions representing substantially all unlicensed seamen employed on American flag vessels. Joseph Curran, President of the NMU, and Joseph Algina, Assistant Secretary of the SIU, are also named as defendants. The Liberian and Panamanian Governments have been granted leave to file briefs as amicus curiae and have done so.

The issues here revolve about plans of the defendant Unions, acting in concert with the International Transport Workers Federation (ITF), to carry out, beginning on December 1, 1958, what the plaintiffs call a boycott and what defendants' counsel term a peaceful protest against the ships operated by the plaintiffs coming into American ports. This is part of a similar plan of action to be carried out simultaneously in some 62 countries throughout the world by unions in those countries. The defendants concede that they intend to carry out their plans (1) by picketing the plaintiffs' ships and inducing other organizations to picket the ships while they are in any port in the United States; (2) by inducing their members who are employees of tugboats and other craft which service plaintiffs' ships, not to aid in the docking and servicing of plaintiffs' ships; and (3) by persuading other unions, including the Teamsters Union, the Oil and Chemical Workers Union, and other labor organizations, to refrain from handling cargo carried by the plaintiffs' vessels and from servicing such vessels.

The complaint, in addition to allegations that plaintiffs are incorporated in Liberia and Panama respectively, and as to the status of the unions, alleges that the plaintiffs own many tank ships, documented under the laws of Liberia or Panama, which regularly carry large quantities of oil in foreign commerce between foreign ports and ports of the United States, constituting a substantial portion of the crude oil supply of the United States; that American oil refineries are to a substantial extent dependent on the regular and orderly flow of such cargoes, and that the ships require the assistance of tugboat, refinery workers and truckers in order to dock, discharge cargo and prepare for their return voyages. It goes on to allege that the unlicensed personnel of plaintiffs' ships are all foreign nationals, none being citizens of the United States; that no strike, labor dispute or controversy of any kind exists between plaintiffs and the personnel manning their ships; that defendant Unions have no collective bargaining agreements with plaintiffs, and have no authority to represent any of such personnel in collective bargaining, and are not eligible to do so under the laws of the United States. It then alleges that the defendant Unions have entered into a combination and conspiracy with the International Transport Workers Federation, a federation of labor unions, with its offices in Europe, to interfere with, obstruct and harass plaintiffs' ships in ports throughout the world in restraint of foreign commerce in violation of the Sherman Anti-Trust Act;

that the Unions intend (a) to throw picket lines around the ships and the docks at which they berth beginning December 1, 1958, (b) to instruct members of their Unions employed by tugboats and other water craft not to service plaintiffs' ships when in port, and (c) to persuade other labor unions to picket plaintiffs' ships and to have their members refuse to aid in the unloading or servicing of plaintiffs' vessels.

The complaint asserts that, unless restrained, the threatened actions of the defendants will cause irreparable damage to plaintiffs since plaintiffs' ships will be unable to reach or leave their docks to discharge their cargoes, to obtain provisions or to perform contracts for the transportation of their cargoes, and that plaintiffs have no adequate remedy at law.

The complaint refers to a treaty of friendship, commerce and navigation between the United States and the Republic of Liberia under which Liberian nationals are permitted to have the liberty of freely coming to American ports and waters and shall be accorded the same treatment as United States vessels and cargoes, and Liberian corporations shall have free access to United States courts of law and equity.

A second cause of action against defendants Curran and Algina, as officers and members of the defendant Unions is brought against them as representatives of their respective Unions under New York law. It is alleged that there is diversity of citizenship between plaintiffs and these defendants. The allegations of the first cause of action are in substance repeated, and it is alleged that the combination and conspiracy charged violate the law of the State of New York.

The prayer for relief demands that the defendants, and those acting on their behalf and in concert with them, be restrained from engaging in the various acts complained of in the Port of New York or any other port of the United States.

The complaint is supplemented by affidavits which in essence document the allegations of the complaint with respect to the threatened acts of the defendants. It is stated that the plaintiff corporations are primarily owned by leading United States oil and bulk carrier companies, and that these vessels under foreign registry and carrying so-called "flags of convenience" are considered by the State and Defense Departments to be a valuable adjunct to the United States merchant marine in times of war or emergency. The affidavits say that the transfer of American vessels to the Liberian and Panamanian flags has been encouraged by the policy of the United States and that the vessels, many of which have been newly constructed in American yards, represent very large investments by American corporations. It is pointed out that industrial carriers are not eligible for the subsidies which are given by the United States to American flag liner operations in the foreign trade, a subsidy which amounted to some $120,000,000 in 1957. It is stated:

"The subsidy is measured principally by the difference between foreign crew wages and American crew wages which are the highest in the world. Because of this all bulk cargoes, such as petroleum or ore, coming to the United States from overseas are transported to American refineries and mills largely by foreign flag ships."

It is stated that the unlicensed personnel of plaintiffs' vessels are aliens recruited in foreign countries, largely in Italy, and are employed under foreign articles. The wages and working conditions of such personnel aboard plaintiffs' vessels are said to be as high or higher than those of their European flag counterparts. The plaintiffs insist that there is no dispute or controversy between them and their personnel, numbers of whom are union represented.

The defendant Unions state in their opposing affidavits that the objective of their protest is directly concerned with preserving the present wages and working standards of the merchant seamen on American vessels whom they represent. They say that their members have

a direct stake in the wages and working standards of plaintiffs' employees since large numbers of American ships have been transferred to foreign registry to the detriment of American seamen with resultant loss of job opportunities.

The defendants describe the "flags of convenience" or "flags of necessity" which these ships fly as "runaway flags" and assert that they are a device by the American interests who control the plaintiff corporations to avoid the necessity of entering into American collective bargaining agreements with the crews of such vessels or the payment of American seamen's wages. It is stated, for example, that the Liberian merchant fleet, most of which is American owned or American financed, now totals almost 1,000 ships, totalling some sixteen million tons, and is the second largest merchant fleet in the world. It is alleged that more than 500 United States flag vessels have been transferred to Liberian registry since 1953, involving the loss of 16,000 jobs to American seamen, and that additional transfers will further impinge upon the job opportunities, wages and standards of their members. The defendant Unions have collective bargaining contracts with various oil companies who concededly are the parent corporations of these plaintiffs, and stress the danger of the depression of wages and working conditions enjoyed by American seamen through the much less expensive non-union wages and inferior working conditions aboard the vessels flying the so-called "runaway flags".

Plaintiffs have moved for a temporary injunction restraining the defendants from carrying out their threatened plan of action pending the hearing and determination of this suit.[1]

The plaintiffs' theory is that the actions of the defendants in concert with the ITF constitute a conspiracy in violation of the Sherman Anti-Trust Act to restrain the foreign commerce of the United States and irreparably to damage the plaintiffs in their business. The defendants, on the other hand, contend that their actions constitute merely peaceful protest and picketing in the course of a controversy arising out of a labor dispute which is free from any injunctive interference by the courts under the provisions of the Norris-LaGuardia Act and that, if any such relief is obtainable, it may be obtained only on application of the National Labor Relations Board pursuant to the Taft-Hartley Act.

A brief discussion of the relevant statutory provisions is necessary in order to provide a setting for the legal problems presented.

The statutes to be considered are the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, the Clayton Act, 15 U.S.C.A. § 12 et seq., the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115 and the Taft-Hartley Act, 29 U.S.C.A. § 151 et seq.

Section 1 of the Sherman Act (15 U.S. C.A. § 1 et seq.) on which plaintiffs rely is as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States or with foreign nations, is declared to be illegal."

It is unnecessary to review the history of the controversy engendered by the application of the Sherman Act to trade union activities and the resultant enactment of the Clayton Act in 1914. See United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788.

The Clayton Act (15 U.S.C.A. § 17) in substance withdrew from the interdiction of the Sherman Act various enumerated

---

1. At the outset it should be noted that the treaty between the United States and the Republic of Liberia which is relied on by the Liberian plaintiffs does not confer upon them or upon their vessels any greater rights than those of American corporations or vessels. It goes no farther than to place them on a parity with American corporations and vessels in the respects enumerated by the treaty. Though no similar treaty between the United States and the Republic of Panama has been shown to exist; I will assume that the Panamanian plaintiffs have the same rights as the Liberian plaintiffs.

practices of trade unions but gave rise to new litigation and renewed controversy in and out of Congress regarding their status.

In 1932, as a result of widespread agitation, Congress enacted the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, to resolve these questions. As stated in United States v. Hutcheson, 312 U.S. at page 231, 61 S.Ct. at page 466:

"The Norris-La Guardia Act removed the fetters upon trade union activities, which according to judicial construction § 20 of the Clayton Act [29 U.S.C.A. § 52] had left untouched, by still further narrowing the circumstances under which the federal courts could grant injunctions in labor disputes. More especially, the Act explicitly formulated the 'public policy of the United States' in regard to the industrial conflict, and by its light established that the allowable area of union activity was not to be restricted, as it had been in the Duplex case [Duplex Printing Press Co. v. Deering, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349], to an immediate employer-employee relation. Therefore, whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act and the Norris-La Guardia Act as a harmonizing text of outlawry of labor conduct."

The Norris-LaGuardia Act provides in Section 4 that the federal courts have no jurisdiction "to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating * * * in such dispute" from doing certain specified acts.

Included among such acts are:

"§ 4(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

* * * * * * *

"(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

"(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

"(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, * * *."

Subsection (c) of Section 13 provides that

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Under subsection (a) of Section 13 a case involves or grows out of a labor dispute,

" * * * when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; * * * or when the case involves any conflicting or competing interests in a 'labor dispute' * * * of 'persons participating or interested' therein * * *."

Subsection (b) of Section 13 characterizes a person or association as participating or interested in a labor dispute "if relief is sought against him or it, and if he or it * * * has a direct or indirect interest therein, * * *."

The Taft-Hartley Act carved certain limited exceptions out of the Norris-LaGuardia Act which are germane here. It provides, § 8(b), 29 U.S.C.A. § 158(b);

"It shall be an unfair labor practice for a labor organization or its agents—

* * * * * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufac-ture, process, transport, or otherwise handle or work on any goods, arti-cles, materials, or commodities or to perform any services, where an ob-ject thereof is: (A) forcing or re-quiring any employer or self-em-ployed person * * * to cease doing business with any other per-son; (B) forcing or requiring any other employer to recognize or bar-gain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provi-sions of section 9; * * *."

These provisions in substance make the so-called "secondary boycott" by employ-ees an unfair labor practice which is con-demned by the Act.

The Taft-Hartley Act, however, does not authorize any person aggrieved by unfair labor practices to bring suit in the courts to enjoin such practices. A. H. Bull Steamship Co. v. Seafarers' Inter-national Union, 2 Cir., 250 F.2d 326, cer-tiorari denied 355 U.S. 932, 78 S.Ct. 411, 2 L.Ed.2d 414. Instead, under the scheme of the Act, the National Labor Relations Board is given exclusive pri-mary jurisdiction over such matters. A complaint must be made to the Board, the Board first examines the facts, and the Board must determine in the first instance whether an unfair labor practice has been committed. The federal courts are prohibited from intervening in such cases except by way of review of Board action or on application of the Board it-self. A party aggrieved may bring suit for damages. But only the Board may seek appropriate injunctive relief (and this temporary only). There is no gen-eral power in the federal courts to grant injunctive relief at the suit of either unions or employers with respect to any unfair labor practices that may exist.

■ Thus, the Labor Management Re-lations Act, while providing an exception to the Norris-LaGuardia Act in a case of such "unfair labor practices" as "the secondary boycott" does not alter the in-terdiction in the Norris-LaGuardia Act against the issuance of injunctions by the federal courts in any labor dispute as there defined except upon application of the National Labor Relations Board.

It is well settled that the Norris-La-Guardia Act forbids the federal courts to issue injunctions even in the case of secondary boycotts. Milk Wagon Driv-ers Union, etc. v. Lake Valley Farm Products, Inc., 311 U.S. 91, 100, 61 S.Ct. 122, 85 L.Ed. 63; Haspel v. Bonnaz, Sin-ger & Hand Embroiderers, etc., D.C.S.D. N.Y., 112 F.Supp. 944, affirmed 2 Cir., 216 F.2d 192.

The initial question presented here, and one which is basic and must be de-termined before the court can consider the merits, is whether the court has any jurisdiction to issue an injunction here in the light of the Norris-LaGuardia Act.

■ In order to determine this ques-tion the first consideration is whether this is a case involving or growing out of a labor dispute. I think that it clearly is.

The term "labor dispute" has been broadly construed by the courts. Time does not permit any extended discussion here of the cases dealing with this sub-ject. Suffice it to say, however, that such cases as Milk Wagon Drivers Union, etc. v. Lake Valley Farm Products, Inc., su-pra; New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 304 U.S. 542, 58 S.Ct. 703, 82 L.Ed. 1012; and United States v. American Federation of Musi-cians, D.C.N.D.Ill., 47 F.Supp. 304, af-firmed 318 U.S. 741, 63 S.Ct. 665, 87 L. Ed. 1120, make it abundantly clear that the term has a very broad definition.

There can be no doubt that on the showing thus far made before me the defendants have a vital interest in the wages and conditions of employment of the crews of the vessels of these plain-tiffs. The defendant Unions, as repre-

sentative of the bulk of the unlicensed seamen employed on American flag vessels, assert that the continuing transfer of American vessels to foreign flags, where wages and working conditions are below the standards on American vessels, will inevitably tend to depress the standards which they have established by collective bargaining for their own members.

They also seek to discourage the further transfer of vessels to foreign flags, and particularly these foreign flags, to deter what they claim to be the shrinkage of job opportunities available to their members because of such transfers.

The defendant Unions assert that if they can succeed by peaceful picketing and protest, and by arousing public opinion, in raising the standards aboard foreign flag vessels, these depressive effects may be avoided.

It cannot be said that these objectives bear no reasonable relation to the wages, hours and working conditions of those whom these Unions represent. Whether or not the Unions are correct in their premise that the raising of standards on Liberian and Panamanian vessels, and the discouragement of continued transfer to foreign flags, will in fact have the effect they claim, is of no moment here.

The plaintiffs claim that, far from aiding these defendants, the threatened conduct will in fact harm them at least indirectly. But it is not for the court to say whether or not the defendant Unions are wise in pursuing the course they seek to follow. That is entirely up to them. As long as their activities concern "terms or conditions of employment, or * * * the association · or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment" (Norris-LaGuardia Act, § 13(c)),

the case is a labor dispute and the courts are prohibited from interfering with such peaceful activities in the absence of fraud or violence.[2]

The plaintiffs, however, contend that the defendants have lost the protection of the Norris-LaGuardia Act here because they are acting and intend to act in concert or collaboration with the International Federation of Transport Workers and other foreign unions. Plaintiffs rely on such cases as Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, for this proposition.[3] The doctrine of these cases is in essence that unions are not exempt from provisions of the Sherman Act if they combine with non-labor groups to create business monopolies, to control the marketing of goods and services or to restrain trade.

■ A union may act in restraint of trade if it does so in furtherance of a legitimate labor purpose either alone or in combination with other unions. If, however, it acts to restrain trade in combination with non-labor or business groups it violates the Sherman Act. In such cases the union loses its exemption from injunctive relief under the Norris-LaGuardia Act and may be enjoined or prosecuted for such activities under the Sherman Act. *Compare:* United States v. Hutcheson, supra, and Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, with Allen Bradley Co. v. International Brotherhood of Electrical Workers, supra; Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750; and Streiffer v. Seafarers Sea Chest Corp., D.C.E.D.La., 162 F.Supp. 602.

■ But it is to be noted that the doctrine of these cases applies only where unions have combined with *business or*

---

2. This is quite apart from any effect on this question which may arise from the conceded fact that the plaintiff corporations are owned and controlled by major American industrial companies. Further reference will be made to this phase of the matter later.

3. See, also, United States v. Employing Plasterers' Ass'n, 347 U.S. 186, 74 S.Ct. 452, 98 L.Ed. 618; Columbia River Packers Ass'n v. Hinton, 315 U.S. 143, 62 S.Ct. 520, 86 L.Ed. 750.

*non-labor groups.* I find nothing in the Norris-LaGuardia Act, or the Sherman Act, or in any other statute which prevents or restricts American labor unions from acting in concert or combination with foreign trade unions or associations of trade unions or with their members, to carry out legitimate labor objectives in the course of a labor dispute. There is no showing or indication here that the International Transport Workers Federation of which the defendant Unions are members, or any of the other foreign unions with which defendants are acting, are anything other than legitimate labor organizations. Combination of the defendants with the ITF or other foreign unions does not in my view bring them within the rule of the Allen Bradley case so as to remove them from the protections of the Norris-LaGuardia Act and make the Sherman Act apply to their intended activities.

The plaintiffs claim, however, that Benz v. Compania Naviera Hidalgo, 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709, and other cases, hold in substance that the provisions of the Norris-LaGuardia Act do not apply to them because their vessels, temporarily in American ports, are foreign ships operated entirely by foreign seamen. It does not seem to me that either the Benz case or the other cases cited by the plaintiffs so hold.

The Benz case merely held that the Taft-Hartley Act did not preempt the field of labor relations to the extent that a suit for damages for picketing of such a foreign vessel by an American union under local state law was forbidden. In the Benz case the Supreme Court was not dealing with an injunction. The question was merely whether the exclusive remedy of the aggrieved party, in this case the owner of a foreign vessel, was under the Taft-Hartley Act and therefore relief could not be sought under state law. The court held, in substance, that the Taft-Hartley Act was not applicable to wage disputes arising on foreign vessels between the nationals of other countries when the vessel is temporarily within our territorial waters. It stated that an affirmative intention of Congress, clearly expressed, was necessary in order "for us to run interference in such a delicate field of international relations".

But it by no means held that the sweeping policy announced by Congress in the Norris-LaGuardia Act for the protection of American union activities from injunction should be withheld where there was a legitimate labor dispute merely because foreign vessels or crews were affected.

Despite their reliance on the Benz case, however, the plaintiffs contend that, since the threatened actions of the defendants involve a secondary boycott in violation of the Taft-Hartley Act provisions against unfair labor practices, they are entitled to an injunction. They argue that, even though the Taft-Hartley Act does not preempt the labor field as far as they are concerned, and though under the doctrine of the Benz case, they have no right to avail themselves of the remedies afforded by Taft-Hartley, nevertheless they are entitled to be protected against the practices condemned by the Act. This, they say, may be accomplished by an injunction despite the provisions of Norris-LaGuardia.

Here the plaintiffs find themselves on the horns of a dilemma. As has been pointed out, the remedy against unfair labor practices condemned by the Taft-Hartley Act lies exclusively under that Act. This court has no jurisdiction to entertain an action to restrain such practices absent a prior appeal to the National Labor Relations Board, and absent application by the Board itself for such injunctive relief. There is no private suit authorized by the Act to enjoin such practices. A. H. Bull Steamship Co. v. Seafarers' International Union, supra.

The plaintiffs claim that under the Benz case they cannot invoke the aid of the National Labor Relations Board because the Taft-Hartley Act has no application to them. Whether or not this is so under the present state of facts is by no means free from doubt. Indeed, the defendants argue that the case of Peninsular and Occidental S. S. Co., 42 LRRM 1113, before the National Labor Relations

Board indicates that the Board would take such jurisdiction in the light of the conceded facts here showing that the plaintiff corporations were controlled by American corporations. Moreover, such cases as Bobolakis v. Compania Panamena Maritima San Gerassimo, S. A., D.C.S.D.N.Y., 168 F.Supp. 236, decided by my brother Kaufman on November 18, 1958; Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254; and Gerradin v. United Fruit Co., 2 Cir., 60 F.2d 927, cited by him there, give some color to the claim that majority ownership and control by Americans of the corporate owners of foreign vessels might make even such statutes as the Taft-Hartley Act applicable to such vessels. Moreover, it may well be that the treaty between the United States and Liberia, which gives Liberian vessels the same rights as American vessels in American ports, might lead to a similar result, at least in so far as the right of the Liberian plaintiffs to seek the aid of the National Labor Relations Board is concerned.

But it is unnecessary to decide this question. If the plaintiffs have the right to seek the aid of the National Labor Relations Board they have not done so. The subject matter of the injunctive relief which plaintiffs seek is then within the exclusive jurisdiction of the Board and I have no right to grant such relief except at the instance of the Board.

Conversely, if the plaintiffs have no right to appeal to the Board, they are plainly not within the class of those entitled to protection of the Taft-Hartley Act. For that Act provides that the only remedy against the unfair labor practices which it condemns is through the Board. If the plaintiffs, as they claim, cannot avail themselves of that procedure then they are squarely up against the provisions of the Norris-LaGuardia Act and do not come within the narrow exception to it thus provided in Taft-Hartley.

The plaintiffs are therefore in the position either of being barred from relief because they did not follow the procedure prescribed by the Taft-Hartley Act or because they could not follow such procedure. There is nothing by way of statute or decision which would authorize this court to issue an injunction to restrain the secondary boycott (assuming one exists here) arising out of a labor dispute except through the Taft-Hartley procedure. Any other form of injunctive relief is prohibited by Norris-LaGuardia.

Plaintiffs deal at some length with the general maritime and defense policies of the United States, which they assert bear on the present situation and which view with approval the practice of operating vessels under foreign flags of convenience or necessity. Such policies do not authorize this court to disregard the plain mandate of Congress laid down in the Norris-LaGuardia Act against injunctions of the character which the plaintiffs now seek. If Congress desired to implement such policies by granting the plaintiffs immunity from the Norris-LaGuardia prohibition, it was free to do so. But this it has not done.

Plaintiffs' second cause of action, alleged to be based upon violations of the law of New York, does not change the picture. Even if there were a violation of New York law, that would not authorize the granting of an injunction by the federal courts in a labor dispute as defined by the Norris-LaGuardia Act, for that Act prohibits the federal courts from exercising any such jurisdiction. Moreover, violations of New York law would furnish no basis for the broad injunctive relief sought by the plaintiffs here to restrain the defendants from committing the threatened acts in any port of the United States.

Thus I conclude, on the basis of all the facts which are now before me, that the plaintiffs have not shown that they are entitled to the preliminary injunction which they seek. To summarize, as far as now appears, this case involves a labor dispute within the meaning of the Norris-LaGuardia Act. There is no showing that any fraud or violence has been or will be resorted to so as to bring the case within those sections of Norris-LaGuardia which authorize injunctive re-

lief by the courts under such exceptional circumstances.

Nothing has been shown which would exclude the defendant Unions from the protection of the Norris-LaGuardia Act and bring them within the provisions of the Sherman Act because they are combining with non-labor or business groups in restraint of trade.

Plaintiffs cannot avail themselves of the provisions of the Taft-Hartley Act against secondary boycotts since they either have not followed or cannot follow the procedure prescribed by that Act which is the exclusive remedy against such proscribed conduct.

They thus have failed to establish the basic essential to the relief which they seek, which is that this court has jurisdiction to grant it. Their motion for a preliminary injunction must therefore be denied.

There remain to be considered various motions made by defendants. Both defendants have cross-moved to dismiss the complaint under Rule 12(b), Fed.Rules Civ.Proc., 28 U.S.C.A., upon the grounds that the court lacks jurisdiction over the subject matter of the action since the exclusive primary jurisdiction is in the National Labor Relations Board under the provisions of the Labor Management Relations Act of 1947, and that the complaint fails to state a claim upon which relief can be granted because of the provisions of the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115. In view of the affidavits which they have submitted their motions are tantamount to motions for summary judgment. Rule 12(b), F.R.C.P.

The defendant SIU has also cross-moved to dismiss the second cause of action based on alleged violations of New York law upon the ground that it is not properly brought as a class action pursuant to New York statutes.

In the twenty-four hours which have elapsed between the argument and this decision I have been primarily concerned with the plaintiffs' motion for a preliminary injunction in view of the imminence of the threatened acts against which plaintiffs seek relief. While I have thoroughly considered all questions which bear on that phase of the matter there may be other questions presented on the defendants' motions which have not yet been considered. I desire to give any such questions the full consideration they require in the light of the importance of the case and of the issues presented. Final dismissal of the complaint here as defendants seek would, indeed, be a drastic remedy and should not be granted without further study. Cf. Red Owl Stores v. Amalgamated Meat Cutters, etc., D.C.D.Minn., 109 F.Supp. 629. The defendants are in no way prejudiced by postponement of the decisions of their motions and whatever rights the plaintiffs have will be preserved.

Submit order in accordance with this decision.