Incres Steamship Company, Ltd., Respondent, *v.* International Maritime Workers Union et al., Appellants.

First Department, July 6, 1960.

178

*H. Howard Ostrin* of counsel (*Herman E. Cooper* and *Eugene N. Sosnoff* with him on the brief; *Cooper, Ostrin & De Varco* and *Miller & Seeger*, attorneys) for appellants.

*Breck P. McAllister* of counsel (*Walter L. Stratton* and *Philip J. Loree* with him on the brief; *Donovan Leisure Newton & Irvine,* attorneys), for respondent.

BREITEL, J. The question in this case is whether an American labor union may strike a foreign ship engaged in foreign commerce while such ship is in an American port and, if not, whether a State court may enjoin such activity.

After a trial, Special Term granted a permanent injunction. The union has appealed.

Plaintiff is a Liberian corporation, actually owned and controlled by Italian nationals. It owns two cruise ships, which are registered in Liberia and fly, as a flag of convenience, the flag of that nation. The ships are claimed to have Monrovia, Liberia, as their home port, although it is conceded that the ships have not been known to have visited that port. The ships, catering largely to American custom, generally ply the sea lanes between New York City and ports in the Caribbean. Their crews are of Italian nationality and are recruited under written articles in Italy. The crews take their leave, and the ships are refitted or repaired in Genoa, Italy, on annual European cruises.

Defendant union is called the International Maritime Workers Union. It was conceived in 1959 at a conference of maritime unions held in London, England, and was formed shortly thereafter by two American maritime unions. Its purpose is to organize foreign seamen employed in ships flying various foreign flags of convenience, which ships are competitive with those that fly the American flag and maintain high labor standards.

The union picketed, organized, and eventually struck plaintiff's two ships while in New York City. As a result the sailings were cancelled. This action ensued and resulted in the permanent injunction which now bars the union from such activity.

There are some peripheral issues and facts raised in the case, but they are hardly determinative: The union stresses the American contacts of the ships by pointing out that their affairs are largely managed in New York City, by an agency corporation, controlled and owned by plaintiff, but incorporated in New York. It stresses too that the cruises run by plaintiff originate in New York City and return there. Plaintiff, on the other hand, stresses various disputed acts committed by the union which it claims to be illegal, but which, on the analysis in this case, it is not necessary to reach.

There are some simple conclusions to be first derived, before the more difficult aspects of the case are considered.

First, the Liberian nationality of plaintiff and the Liberian registry of the ships should not be conclusive of the character

of shipping involved. The National Labor Relations Board, in appropriate cases involving "American" ships flying foreign flags of convenience has so determined, and the conclusions are entirely persuasive (*Peninsular & Occidental S. S. Co.*, 120 N. L. R. B. 1097 [7958]; *Eastern Shipping Corp.*, N. L. R. B. Case No. 12–RC–415 [1959], CCH–NLRB Dec. ¶56,698 [1959–1960]). So, too, has the United States District Court in this district (*Afran Transp. Co. v. National Mar. Union*, 169 F. Supp. 416 [BRYAN, J.], in an especially well-considered opinion, cited with evident respect by the Supreme Court in *Marine Cooks* v. *Panama S. S. Co.*, 362 U. S. 365). Looking beyond the flag of convenience, however, does not change the character of the ships here from foreign to domestic. The shipping is still foreign — Italian in fact — because of Italian ownership, Italian crews, Italian contracts of hiring, and because the ships are engaged in foreign commerce on the high seas. Quite a different case would be presented if the ships were used exclusively or largely on inland waterways, or for that matter, if one or more of the other factors mentioned were changed. This does not mean that a change in any of these factors would require a contrary result. It is that there would then be a doubtful question of applicability of the Federal labor statute and the rule in *Garner* v. *Teamsters Union* (346 U. S. 485) and *San Diego Unions* v. *Garmon* (359 U. S. 236) would apply. (See *Dooley* v. *Anton*, 8 N Y 2d 91.)

Second, in the absence of Federal pre-emption of the field by Federal labor statutes or preclusion of jurisdiction by virtue of labor anti-injunction statutes, the striking or other interference with the internal management of the crew of a vessel away from its home port is illegal (*Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31). Such interference is illegal because it violates public policy, and, in the case of an American ship, is even a criminal act (U. S. Code, tit. 18, §§ 2192, 2193). Thus, in the *Southern S. S.* case, it was held that the National Labor Relations Board could not order the reinstatement of seamen discharged for striking an American ship away from its home port even though it had also found that the men had struck because of the employer's unfair labor practices in violation of the then National Labor Relations Act. The court said (pp. 38–39): "Ever since men have gone to sea, the relationship of master to seaman has been entirely different from that of employer to employee on land. The lives of passengers and crew, as well as the safety of ship and cargo, are entrusted to the master's care. Every one and every thing depend on him. He must command

and the crew must obey. Authority cannot be divided. These are actualities which the law has always recognized. On the one hand, it has imposed numerous prohibitions against conduct by seamen which destroys or impairs this authority. We shall consider in a moment the nature and scope of the criminal sanctions imposed in case of revolt and mutiny. But it is worth noting here that the form of the ' shipping articles,' which the master and every member of the crew must sign prior to the voyage, has been carefully prescribed by Congress, and that these articles contain this promise: ' And the said crew agree  *  *  *  to be obedient to the lawful commands of the said master  *  *  *  and their superior officers in everything relating to the vessel, and the stores and cargo thereof, whether on board, in boats, or on shore  *  *  *,'  U. S. C., Title 46, §§ 564, 713. On the other hand, workers at sea have been the beneficiaries of extraordinary legislative solicitude, undoubtedly prompted by the limits upon their ability to help themselves. The statutes of the United States contain elaborate requirements with respect to such matters as their medicines, clothing, heat, hours and watches, wages, and return transportation to this country if destitute abroad. U. S. C., Title 46, §§ 651–692, 1131. It is in this setting of fact and law that we must test the validity of the Board's order of reinstatement." The court went on to find that " the strike was unlawful from its very inception " (p. 48). The policy underlying this principle in the law of the sea is one that has had recognition for a long time, and insofar as foreign ships are concerned, has special vitality because of the comity among nations (cf. *Wildenhus's Case,* 120 U. S. 1; *Lauritzen* v. *Larsen,* 345 U. S. 571).

Third, apart from the question of public policy pervading foreign shipping, and particularly the law of the sea as to the management of a ship's crew, the union activity would be privileged. That is, the economic self-interest of American workers to protect themselves from the competitive depredations of others using foreign labor working under substandard conditions would provide just cause for the intentional economic injury directed to such competition (see Frankfurter and Greene, Labor Injunction, 24 *et seq.*; Forkosch, Treatise on Labor Law, 398 *et seq.*; *Exchange Bakery & Restaurant* v. *Rifkin,* 245 N. Y. 260). While most of the cases and most of the commentators have considered only domestic disputes, the same principle of justification which applies in the domestic dispute in reason and policy should apply to one involving foreign commerce, provided

of course, no other overriding policy or law makes the activity illegal.*

On application of but these three conclusions last discussed, the union's activity was wrongful and not privileged, because it interfered with the engagement and management of the ships' crews while the ships were away from the home port. For this purpose, obviously, Monrovia is not the home port, but neither is New York City, merely because the latter is the most important port in the traffic carried by the ships. For the purposes of this *de facto* Italian line, it is evident that Genoa in Italy is the home port.

But the discussion may not be concluded at this point. The questions still remain whether there has been Federal pre-emption by virtue of the Federal labor statutes and whether there are any jurisdictionally inhibiting labor anti-injunction statutes.

The Supreme Court has held that the National Labor Management Relations Act does not apply to foreign shipping. In *Benz* v. *Compania Naviera Hidalgo* (353 U. S. 138, 142–144), the court said, referring to the Federal Labor Management Relations Act:

" The parties point to nothing in the Act itself or its legislative history that indicates in any way that the Congress intended to bring such disputes within the coverage of the Act. Indeed the District Court found to the contrary, specifically stating that the Act does not ' cover a dispute between a foreign ship and its foreign crew ' * * *

" Our study of the Act leaves us convinced that Congress did not fashion it to resolve labor disputes between nationals of other countries operating ships under foreign laws. The whole background of the Act is concerned with industrial strife between American employers and employees."

Later, in *Marine Cooks* v. *Panama S.S. Co.* (362 U. S. 365, 369), the court, speaking of its holding in the *Benz* case, said: " The question in the *Benz* case was whether the Labor Management Relations Act of 1947 governed the internal labor relations of a foreign ship and its foreign workers under contracts made abroad while that ship happened temporarily to be in American waters. The *Benz* case decided that the Labor Management Relations Act " had no such scope or coverage and that it accordingly did not " pre-empt the labor relations field so as to bar an action for damages for unlawful picketing under Oregon law."

---

* On this analysis, there is disagreement with the conclusion of the trial court that defendant union did not have an economic self-interest in seeking to organize plaintiff's ships, which interest might justify the union's economic activity, provided its methods did not fail of legality for other reasons, such as interference with the ship's discipline, secondary boycott, and the like.

Notably, the Supreme Court did not hold that there was a Congressional abstention from regulating in the field, so that there might be a pre-emption by silence, that is, an intention to leave the area of foreign shipping untrammelled by the several regulatory prohibitions and protections provided in the Federal statute. Instead, it held that Congress did not intend to apply the Federal statute at all to foreign shipping. In consequence, the rule in *Garner* v. *Teamsters Union* (346 U. S. 485, *supra*) and *San Diego Unions* v. *Garmen, supra,* (359 U. S. 236, *supra*) is similarly inapplicable.

True, in this case, as distinguished from the *Benz* case, the contact with the American port is regular rather than a one-instance occurrence. But, in both cases, the custom is American: in the one a cargo of wheat was to be taken on for transhipment, while in the other it consists of American passengers. The distinction is not sufficient to avoid the impact of the holding in the *Benz* case.* Moreover, until the Supreme Court narrows the major premise of the holding in the *Benz* case, a State court is concluded by it.

In the airline field there is an example of intentional Congressional abstention from applying a labor statute to events and relationships occurring in foreign commerce outside the continental United States. Thus it has been held that the Railway Labor Act (U. S. Code, tit. 45, § 151 *et seq.*) does not apply to employees of American airlines engaged in flights between points

---

* "But application of American statutes to labor relations on board foreign oceangoing vessels only transitorily in United States waters presents different problems and must be considered in light of principles of international law. Under settled doctrine, ports and adjacent waters are within the sovereign territory of the coastal state, which may, therefore, prohibit access by foreign vessels or permit entry only on such conditions as it may choose to impose. The absolute power of the coastal state is tempered, however, by the demands of comity among nations, which require it to exercise a high degree of self-restraint, particularly in matters involving the 'internal economy' of a foreign vessel.

"In determining whether to exercise its sovereign prerogatives, the coastal state must consider its self-interest shared with other nations — an 'inclusive' interest — in free commercial navigation in addition to the local interests which it seeks to protect by exercise of jurisdiction — its 'exclusive' interests — and the exclusive interests of foreign states. Regulation which constitutes an unreasonable interference with the internal economy of foreign ships may evoke defensive exercise of jurisdiction by other coastal states, thus subjecting oceangoing vessels to different laws in every port. For example, if a coastal state required that every vessel entering its waters employ a crew consisting entirely of the coastal state's nationals, other states might be forced to respond by comparable legislation, and mutually beneficial world trade would be brought to a virtual standstill." (Comment: The Flag-of-Convenience Fleet, 69 Yale L. J. 498, 504–505.)

outside the continental United States, based entirely and exclusively on legislative intention (*Air Line Stewards* v. *Northwest Airlines,* 267 F. 2d 170, cert. denied 361 U. S. 901; see, also, *Air Line Dispatchers Assn.* v. *National Mediation Bd.,* 189 F. 2d 685, 690, cert. denied 342 U. S. 849).

Consequently, it is not possible to find that the Federal labor statute applies to foreign shipping or to the dispute which gave rise to this case. Hence, there is no Federal pre-emption ousting the State courts of jurisdiction.

The Federal labor anti-injunction statute (U. S. Code, tit. 29, § 101 *et seq.*) applies, of course, only to the Federal courts. In *Marine Cooks* v. *Panama S. S. Co.* (362 U. S. 365, *supra*), it was held that the Federal anti-injunction statute deprived Federal courts of jurisdiction to enjoin illegal labor union activity in foreign shipping, even though the Federal labor statute (Labor Management Relations Act) did not apply. In brief, it was held that the anti-injunction statute had a broader applicability than did the regulatory labor statute.

While it is true that New York's labor anti-injunction statute (Civ. Prac. Act, § 876-a) was closely fashioned after the Federal statute, and it is even arguable that it was intended to be even more restrictive of judicial labor injunctions, the New York statute has been much more narrowly defined by the highest court of this State. It has been held that, in order for a dispute to qualify under the statute as a " genuine labor dispute ", the dispute must have had a " lawful purpose ". (*Goodwins, Inc.* v. *Hagedorn,* 303 N. Y. 300, 305; *Dinny & Robbins* v. *Davis,* 290 N. Y. 101; cf. *Florsheim Shoe Store Co.* v. *Shoe Salesmen's Union,* 288 N. Y. 188; *American Guild of Musical Artists v. Petrillo,* 286 N. Y. 226; *Opera on Tour* v. *Weber,* 285 N. Y. 348; *Thompson* v. *Boekhout,* 273 N. Y. 390; see *May's Furs & Ready-to-Wear* v. *Bauer,* 282 N. Y. 331; *Arnold Bakers* v. *Strauss,* 1 A D 2d 604, 608, appeal dismissed 2 N Y 2d 721.) As a novel question one might well quarrel with such a rendition of the statute, but the weight of authority is hardly escapable by an intermediate appellate court.

Consequently, it is concluded that no labor anti-injunction statute precludes the State court from enjoining the " illegal " activity of defendant union in striking plaintiff's ships and picketing for the purpose of inducing a breach of the articles of hiring of the ships' crews and the disciplines of the ships.

In reaching these conclusions one is aware of the substantial competitive effect of these foreign flag ships upon the condition of the American seaman. But the problem is one for Congress. It has the power to take whatever action is necessary, for the

solution is largely limited only by its own discretion (*Benz* v. *Compania Naviera Hidalgo,* 353 U. S. 138, 142, *supra*). Indeed, the Federal Government has not hesitated in many areas to intrude on the "internal economy" of a foreign ship as a condition to entry into American ports (see *Benz* case, *supra,* pp. 144–145). It is one thing for Congress to intrude in this field; it would be quite another for the courts to do so. This was expressed succinctly in the *Benz* case: "For us to run interference in such a delicate field of international relations there must be present the affirmative intention of the Congress clearly expressed. It alone has the facilities necessary to make fairly such an important policy decision where the possibilities of international discord are so evident and retaliative action so certain. We, therefore, conclude that any such appeal should be directed to the Congress rather than the courts." (p. 147.) A State court can hardly say less; it should not say more.

On the foregoing reasoning the order and judgment granting a permanent injunction should be substantially affirmed. In one respect, however, it requires modification. The second ordering paragraph should be modified to provide that the words "also from picketing said vessels for any purpose" should read "also from picketing said vessels for any such purpose", the word " such " being necessary to limit the injunction to the condemned activity as presented in this case.

Accordingly, the order and judgment should be modified, on the law and the facts, and in the exercise of discretion, to insert the word "such" in the second ordering paragraph as hereinabove-mentioned, and should otherwise be affirmed, with costs to plaintiff-respondent.

BOTEIN, P. J. (dissenting). Plaintiff, a corporation organized under the laws of Liberia, operates two cruise vessels under the Liberian flag. All of plaintiff's officers and shareholders are foreign nationals; and the ships are manned by alien crews hired at Genoa, Italy. No Liberian citizen, however, plays any role in either the management of plaintiff or in the operation of its ships.

All of plaintiff's cruises originate in New York, and its passengers are principally Americans. Plaintiff occupies common office space in the City of New York with its agency, a New York corporation. Plaintiff's president is also an officer and director of the agency, which sometimes alone, sometimes jointly with plaintiff, provisions the ships, books passengers, schedules departures and arrivals and attends to ships' repairs — all out of the New York office.

Defendant International Maritime Workers Union was formed recently by two large maritime unions affiliated with AFL-CIO. An avowed major purpose, recited in the preamble to the union's constitution, is to bring strong and responsible union representation to the crews of ships flying so-called "flags of convenience". Defendant union contends that plaintiff's ships fall into this category, and that their victimized crews are denied human dignity, decent wages and working conditions. When plaintiff's vessels ply regularly in and out of New York, the union claims their substandard labor conditions also pose a real menace to the preservation of the high, hard-won standards prevailing on American flag vessels under contract with American maritime unions.

Representatives of the union made contact with crew members aboard both of plaintiff's vessels, for the purpose of organizing them, to the end that they would be represented by the union. They also picketed both ships upon their arrival in New York Harbor and were successful in preventing their scheduled departures. The picketing at all times was orderly and peaceful — in fact, the pickets never exceeded three in number.

Plaintiff served a summons and complaint seeking a permanent injunction and damages of defendant union and its executive director. Following trial an order and judgment were entered, denying defendants' motion to dismiss the complaint on the ground the court lacked jurisdiction over the subject matter, permanently enjoining defendants from interfering in any way with the operation and management of the two ships and from picketing them for any purpose and severing and reserving plaintiff's claim for damages for later trial.

In holding that jurisdiction resided in the State courts, the Justice at Special Term relied solidly on the 1957 decision of the Supreme Court in *Benz* v. *Compania Naviera Hidalgo, S. A.* (353 U. S. 138), which he said was " squarely on all fours with the instant case ". In the *Benz* case, as here, the vessel, a foreign tramp steamer, flew the Liberian flag, had foreign owners, and the crew complement was composed of foreign nationals. Unlike the fact situation presented here, however, the owners of the steamer in the *Benz* case had no office or agents in the United States, and the ship did not receive the major part of its business from American nationals nor visit an American port regularly; and after a single, initial, fairly haphazard contact with an American port the steamer left United States territorial waters and thereafter had no charter commitment to return. Again, unlike the instant case, in which a union has sought directly to organize foreign seamen on a foreign ship to preserve, among

other things, American wage and working standards, in *Benz* the unions were interested primarily in the internal economy of the ship and picketed out of sympathy for a strike of foreign seamen.

As the opinion itself indicates, the *Benz* case had rather special facts (p. 142): "It should be noted at the outset that the dispute from which these actions sprang arose on a foreign vessel. It was between a foreign employer and a foreign crew operating under an agreement made abroad under the laws of another nation. The only American connection was that the controversy erupted while the ship was transiently in a United States port and American labor unions participated in its picketing."

The compass of the *Benz* holding was recently outlined succinctly in *Marine Cooks* v. *Panama S. S. Co.* (362 U. S. 365). In the latter case the Supreme Court said (p. 369): "The question in the *Benz* case was whether the Labor Management Relations Act of 1947 governed the internal labor relations of a foreign ship and its foreign workers under contracts made abroad while that ship happened temporarily to be in American waters. The *Benz* case decided that the Labor Management Relations Act had no such scope or coverage and that it accordingly did not preempt the labor relations field so as to bar an action for damages for unlawful picketing under Oregon law."

The court in this later case was again confronted with the picketing of a Liberian ship, manned by an alien crew. In this situation, however, there was no labor dispute between the ship's employees and the ship's management. The picketing, carried on by an American union, was to protest the loss of AFL-CIO seamen's livelihood to foreign flag ships with substandard wages and conditions. In these circumstances the Supreme Court rejected the District Court's assumption of jurisdiction to issue an injunction on that court's stated ground that the picketing was an "unlawful interference with foreign commerce" and interfered "in the internal economy of a vessel registered under the flag of a friendly foreign power". This position had been also adopted by the Court of Appeals, in reliance almost entirely on the holding in the *Benz* case (265 F. 2d 780, 786 [C. C. A. 9th, 1959]).

While the Supreme Court in *Marine Cooks* expressly bottomed its dismissal of the petition for an injunction on the limitations upon the courts' jurisdiction imposed by the Norris-La Guardia Act (U. S. Code, tit. 29, § 101 *et seq.*), it gave expression to some intriguing dictum. In a footnote (p. 371) the court pointed to the special facts present in the *Benz* situation (362 U. S. 365,

371–372, n. 12) : "Unlike the situation in the *Benz* case, in which American unions to which the foreign seamen did not belong picketed the foreign ship in sympathy with the strike of the foreign seamen aboard, the union members here were not interested in the internal economy of the ship, but rather were interested in preserving job opportunities for themselves in this country. They were picketing on their own behalf, not on behalf of the foreign employees as in *Benz*. Though the employer here was foreign, the dispute was domestic. For a thoughtful discussion of the impact of foreign employment upon American labor standards, see *Afran Transport Co.* v. *National Maritime Union,* 169 F. Supp. 416, 1959 Am. Mar. Cas. 326 (holding that the Norris-La Guardia Act withdrew from Federal District Courts jurisdiction to issue labor injunctions in a labor dispute strikingly like the one here involved). But see *Fianza Cia. Nav. S. A.* v. *Benz,* 1959 Am. Mar. Cas. 1758, 37 CCH Lab. Cas. ¶ 65,495."

Therefore, in the *Benz* case not only were there no substantial American contacts with the ship operated under the foreign flag of convenience, such as are present in this case; but the picketing by the unions was evidently viewed as prompted essentially out of sympathy for the objectives of foreign seamen on a foreign boat, and not to better the lot of American sailors. The three domestic unions, by injecting themselves into this wholly foreign dispute, placed themselves in the traditionally dangerous position of strangers intermeddling in a family fight.

It has been argued forcefully that the considerations of "international relations", "possibilities of international discord", etc., which so troubled the court in the *Benz* case when contemplating the applicability of the Labor Management Relations Act to foreign ships with foreign crews, are relevant with regard to the rights guaranteed to employees under section 7 of the act but are not relevant with regard to the prohibitions of section 8 of the act. (Comment *"The Effect of United States Labor Legislation on the Flag-of-Convenience Fleet: Regulation of Shipboard Labor Relations and Remedies Against Shoreside Picketing."* 69 Yale L. J. 498, 516, 523.)

The National Labor Relations Board had in a somewhat similar situation refused to apply the protections of section 7 of the act while enforcing the prohibitions of section 8. (Cf. *Matter of Sailors' Union of Pacific* [*Moore Dry Dock Co.*], 92 N. L. R. B. 547 [1950], with *Compania Maritima Sansoc Limitada,* Case No. 20 RC-809 [5/1/50], CCH NLRB Decisions 1950–1951, ¶ 10,081.) Only the dissenter in *Benz* accepted this argu-

ment (353 U. S. 138, 147–150). (Cf. *Teamsters Union* v. *New York, New Haven & Hartford R. R. Co.,* 350 U. S. 155 [1956].)

Even at common law it was recognized that the deck of a visiting ship afforded no sanctuary from certain rights of local government; and that " all things done on board which affected only the vessel or those belonging to her, and *did not involve the peace or dignity of the country, or the tranquility of the port,* should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged " (*Wildenhus's Case,* 120 U. S. 1, 12 [1887]) (emphasis supplied).

The instant case would appear to rest somewhere between the situations posed in *Benz,* on the one hand, and *Marine Cooks,* on the other. Defendants here were picketing not only on behalf of the foreign employees of a foreign ship, as in *Benz,* but on their own behalf, as in *Marine Cooks.* And whatever might be plaintiff's status under international law, by all practical labor relations reckoning its operations are as singularly domestic as though its ships sailed the Great Lakes.

If the *Benz* rule is applicable to all ships flying flags of convenience, it apparently has not been followed by the National Labor Relations Board as devoutly as it should have been by the tribunal endowed with " exclusive primary competence " (*San Diego Unions* v. *Garmon,* 359 U. S. 236, 245) in these matters. In *Peninsular & Occidental S.S. Co.* (120 N.L.R.B. 1097 [1958]) the board found jurisdiction and distinguished the *Benz* case where " the employer, as we have found above, is a domestic corporation, not a foreign national and the crews include a number of American citizens and resident aliens. Moreover, the crews do not sign shipping articles containing conditions of employment prescribed by a foreign government, but rather sign old type American articles. As for the ships, their home port is, for all practical purposes, at Miami, Florida. Further, though they are registered under foreign laws, they clearly do not operate under foreign laws, the crews, as noted, signing American shipping articles and the only inspections of these ships being performed by agencies of the United States Government." (120 N. L. R. B. 1097, 1101–1102, n. 7.)

In the most recent case the union, evidently unable to establish indirect American ownership of the ships flying flags of convenience, as in *Peninsular & Occidental,* urged instead that jurisdiction should be asserted by the National Labor Relations Board regardless of the nationality of the owner of the vessel. The Regional Director dismissed the petition for an election, but the board ordered the petition reinstated to resolve the substantial and material issues presented (*Eastern Shipping*

*Corp. McCormack Shipping Corp.* [*S. I. U.*], 12-RC 415 [9/21/59], CCH NLRB Dec. 1959–1960, ¶ 56,698).

Accordingly, the National Labor Relations Board apparently does not consider the fact that the employer is a foreign entity operating a ship under the flag of a foreign country as an insurmountable barrier to the assertion of its jurisdiction in labor disputes. For all that appears, the board may take the view that its jurisdiction is proscribed by the *Benz* case only when some pre-existing, previously confined shipboard dispute spills onto the dock, where an American union lends a hand. (Cf. Comment Yale L. J., *op. cit. supra,* p. 521.) Short of that, the board may take the position that, while it will not afford relief under section 7 because of possible conflict with settled rules of international law and principles of comity, it will enforce the prohibitions of section 8 against an American union which engages in prohibited concerted activity directed against a foreign ship regularly doing business in a United States port. It must be borne in mind that the board may maintain jurisdiction if it has the statutory power either to protect or prohibit the activities in issue.

In such event, and at the very least, it can be argued strongly that this controversy involves rights and obligations exclusively within the primary jurisdiction of the National Labor Relations Board, to which under the Labor Management Relations Act both State and Federal courts must defer when conduct complained of in a labor dispute is either protected or proscribed by the act. The basis and rationale of this policy are stated in *Garner* v. *Teamsters Union* (346 U. S. 485, 490–491) : '' Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confine primary interpretation and application of its rules to a specific and especially constituted tribunal and described a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to o tain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies * * *. A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or on application of the federal Board, precludes state courts from doing so. Cf.

*Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41; *Amalgamated Utility Workers* v. *Consolidated Edison Co.,* 309 U. S. 261.''

In *San Diego Unions* v. *Garmon* (359 U. S. 236, 244) the Supreme Court defined the boundaries of judicial action still more sharply, holding that when '' an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted'' (p. 245). The court stated (pp. 244–245): '' At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board.''

Chapter 7 of title 29 of the United States Code will be searched in vain for language to support the contention that by statutory inhibition the jurisdiction given the National Labor Relations Board by the Labor Management Relations Act does not encompass labor disputes involving '' foreign '' ships. The term '' commerce '' includes '' trade, traffic, commerce, transportation * * * **among the several States** * * * or between any foreign country and any State * * * or between points in the same State * * * but through * * * any foreign country'' (§ 152, subd. [6]). The term '' affecting commerce '' includes '' burdening or obstructing commerce or the free flow of commerce, or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce '' (§ 152, subd. [7]).

We are told that Congress created the National Labor Relations Board to provide reasonable measures to prevent the disruption of '' interstate and foreign commerce '' (*Consolidated Edison Co.* v. *Labor Bd.,* 305 U. S. 197, 221–222 [1938]). That the dispute at issue in this case has disrupted '' foreign commerce '' is beyond argument. The decision in the *Benz* case, relying as it does exclusively on negative legislative history, must be confined rigorously to the fact situation presented by that case. Otherwise, the finding that the Labor Management Relations Act does not apply to '' wage disputes arising on foreign vessels between nationals of other countries when the vessel comes within our territorial waters '' (353 U. S. 138, p.

142) would ignore the plain provisions of the act. Throughout the *Benz* case the court carefully limits the scope of its decision by restrictive language such as " such disputes " and the " circumstances such as those posed here" (pp. 142, 144).

Accordingly, neither the act, the board nor the Federal courts have ever held that the plain terms of the Labor Management Relations Act do not encompass "foreign " shipping. To the contrary, the board and the courts have indicated that the act may apply when a union of American workmen takes collective action against a foreign ship in the interest of preserving " the terms and conditions of their employment " by stabilizing " competitive wage rates and working conditions within and between industries " (U. S. Code, tit. 29, § 151). (Cf. *Afran Transp. Co. v. National Maritime Union, op. cit. supra; Eastern Shipping Corp.* [S. I. U.], *op. cit., supra.*)

Accordingly, the order denying defendants' motion to dismiss the complaint for lack of jurisdiction should be reversed and the motion granted, and the judgment granting a permanent injunction should be reversed and the complaint dismissed, both reversals on the law and the facts.

VALENTE and McNALLY, JJ., concur with BREITEL, J.; BOTEIN, P. J., dissents and votes to reverse and dismiss the complaint in opinion, in which STEVENS' J., concurs.

Order and judgment modified, on the law and on the facts and in the exercise of discretion, to insert the word " such " in the second ordering paragraph as mentioned in the opinion of Mr. Justice BREITEL, and, as so modified, affirmed, with costs to plaintiff-respondent.

Settle **order.**