[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11341

_____

PROFESSIONAL AIRLINE FLIGHT CONTROL ASSOCIATION,

Plaintiff-Appellant,

*versus*

SPIRIT AIRLINES, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cv-60396-RKA

_____

Before WILLIAM PRYOR, Chief Judge, MARCUS, Circuit Judge, and MIZELLE,* District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the district court had subject-matter jurisdiction over a labor dispute between Spirit Airlines and the union that represents Spirit's flight dispatch officers. The Railway Labor Act, 45 U.S.C. § 151 *et seq.*, divides labor disputes into two categories: disputes over the interpretation of an existing agreement are "minor" and resolved exclusively through binding arbitration, and disputes over proposed changes to an agreement or over a new agreement are "major" and addressed through bargaining and mediation. During a major dispute, district courts have subject-matter jurisdiction to enjoin violations of the status quo. But district courts ordinarily lack jurisdiction over minor disputes. The Professional Airline Flight Control Association complained that Spirit is attempting to change their agreement. Spirit responded that its unilateral decision to open a second operations control center is permitted by the parties' agreement. The district court agreed with Spirit that this dispute is minor and dismissed the action for lack of subject-matter jurisdiction. We affirm.

---

* Honorable Kathryn Kimball Mizelle, United States District Judge for the Middle District of Florida, sitting by designation.

## I. BACKGROUND

The Professional Airline Flight Control Association serves as the exclusive bargaining representative of the approximately 75 flight dispatch officers employed by Spirit Airlines, Inc. Flight dispatch officers manage "major flight decisions" such as flight paths, fuel loads, and whether to dispatch flights. Spirit and the union entered into a collective bargaining agreement in 2018 that is effective through October 2023. Neither side can amend the agreement earlier than 150 days before October 15, 2023.

The dispatch officers work at an operations control center in Miramar, Florida, where Spirit is headquartered. In February 2020, Spirit informed the union that because of the threat of hurricanes in Miramar, it intended to move the operations control center to Nashville, Tennessee. Under section 6.D of the collective bargaining agreement, the parties began negotiating about moving expenses.

In September, Spirit informed the union that instead of moving the control center to Nashville, it had decided to keep the Miramar control center and open a second control center in Orlando, Florida. The parties recommenced bargaining, now regarding a wider set of issues, "such as bidding to work in one center or the other, cross-center seniority rights, and cross-center shift trading." In January 2021, the parties had not reached an agreement, and Spirit informed the union that it would not engage in further negotiations. About a week later, Spirit publicly announced its intention to open the second control center in Orlando and to either

transfer some employees there from Miramar or hire new employees. Neither party has made a formal proposal to amend the existing agreement.

In February 2021, the union filed suit in the district court. It alleged that Spirit's decision to open a second control center was an attempt to change the parties' agreement about conditions of employment, so the dispute was major. And it argued that Spirit was required by the Railway Labor Act to negotiate over the second control center and to maintain the status quo in the meantime. The union sought injunctive relief.

Spirit moved to dismiss the complaint. It argued that the collective bargaining agreement permits it to unilaterally decide to open a second control center. It argued that the dispute concerned the interpretation of the existing agreement, not a proposed change to the agreement, which made the labor dispute a minor one over which the district court lacked subject-matter jurisdiction. The district court ruled that the labor dispute was minor and dismissed the complaint for lack of subject-matter jurisdiction.

## II. STANDARD OF REVIEW

We review issues of both subject-matter jurisdiction and the classification of a dispute as major or minor under the Railway Labor Act *de novo. See Calderon v. Baker Concrete Constr., Inc.*, 771 F.3d 807, 810 (11th Cir. 2014); *CSX Transp., Inc. v. Bhd. of Maint. of Way Emps.*, 327 F.3d 1309, 1320 (11th Cir. 2003).

## III. DISCUSSION

The Railway Labor Act, 45 U.S.C. § 151 *et seq.*, was enacted in 1926 "to encourage collective bargaining by railroads and their employees in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce," *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union (Shore Line)*, 396 U.S. 142, 148 (1969); *see* 45 U.S.C. § 151a. Congress later amended the Act to govern the airline industry. *See* 45 U.S.C. §§ 181–88. The Act provides the procedures that carriers and their employees must follow to resolve labor disputes.

There are two types of disputes under the Act, and each triggers different procedural requirements. *See Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n (Conrail)*, 491 U.S. 299, 302–04 (1989). Minor disputes are those that concern "a collective agreement already concluded or . . . a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision . . . ." *Id.* at 303 (quoting *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)); *see* 45 U.S.C. § 152 Sixth (discussing disputes "arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions"). Major disputes are about "the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Conrail*, 491 U.S. at 302 (quoting *Burley*,

325 U.S. at 723); *see* 45 U.S.C. § 152 Seventh (discussing changes to employees' "rates of pay, rules, or working conditions . . . as embodied in agreements"). In short, "major disputes seek to create contractual rights, [and] minor disputes to enforce them." *Conrail*, 491 U.S. at 302.

A minor dispute that the parties cannot resolve is subject to compulsory arbitration before an adjustment board created by the airline and its employees. *See id.* at 303–04; *Whitaker v. Am. Airlines*, 285 F.3d 940, 943–44 (11th Cir. 2002) (explaining the differences between the adjustment boards for railroads and those for airlines); 45 U.S.C. § 184. The adjustment board has exclusive jurisdiction over a minor dispute. *Conrail*, 491 U.S. at 304; *see also Pyles v. United Air Lines, Inc.*, 79 F.3d 1046, 1050 (11th Cir. 1996) ("Congress intended that these 'minor disputes' be resolved through the grievance procedures of the [Railway Labor Act] rather than in federal court."). Employees may not strike over a minor dispute, and the parties are ordinarily not required to maintain the status quo during arbitration. *CSX*, 327 F.3d at 1320. There is a limited exception: district courts may issue a status-quo injunction if needed to preserve the adjustment board's jurisdiction "by preventing injury so irreparable that a decision of the Board in the unions' favor would be but an empty victory." *Bhd. of Locomotive Eng'rs v. Mo.-Kan.-Tex. R.R. Co.*, 363 U.S. 528, 534 (1960). But the Supreme Court has "never recognized" a general right to a status-quo injunction over a minor dispute where the employer does not also seek a strike injunction. *Conrail*, 491 U.S. at 304. In any event, that

"extremely narrow" ground for an injunction, *Int'l Bhd. of Teamsters Local 19 v. Sw. Airlines Co.*, 875 F.2d 1129, 1136 (5th Cir. 1989), is not relevant to this appeal because the union does not argue that it is entitled to injunctive relief if the dispute is minor.

By contrast, when either party seeks to change "agreements affecting rates of pay, rules, or working conditions," section 6 of the Act requires the party that seeks the change to give 30 days' written notice to the other party. 45 U.S.C. § 156. The parties then bargain over the proposed change, and either side can request the services of a mediation board. *Id.* These major-dispute procedures are "purposely long and drawn out," and the parties must "refrain from altering the status quo . . . while the Act's remedies [a]re being exhausted." *Shore Line*, 396 U.S. at 148–49 (citation omitted); *see* 45 U.S.C. § 156. And in these cases, federal courts may enjoin a violation of the status quo "without the customary showing of irreparable injury." *Conrail*, 491 U.S. at 303.

When a dispute under the Act "reaches a federal court, [the court's] central responsibility is that of taxonomist—classifying the dispute as major or minor." *BLET GCA UP, Cent. Region v. Union Pac. R.R. Co.*, 988 F.3d 409, 413 (7th Cir. 2021) (internal quotation marks and citation omitted). "[A] union will typically claim a dispute is major because it is permissible to strike if the carrier insists on implementing a certain policy. Conversely, a carrier will insist the dispute is minor because it can proceed with the policy while the parties" arbitrate. *CSX*, 327 F.3d at 1320. If either side has filed a section 6 notice proposing to amend an existing agreement or to

establish a new agreement, classification is easy: the dispute is major. But when neither side has filed a section 6 notice, the issue requires more analysis.

The distinction "between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help." *Conrail*, 491 U.S. at 305. Instead, the question is "whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action." *Id.* "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id.* at 307. A party that argues that a dispute is minor—typically the carrier—has only a "light" burden of proof. *Id.* at 307 (citation omitted). And "if a reasonable doubt exists as to whether the dispute is major or minor, [the courts] will deem it to be minor." *CSX*, 327 F.3d at 1321 (citation omitted).

This dispute is minor. Spirit's unilateral decision to open a second control center is arguably justified by the terms of the existing collective bargaining agreement. Even if its contractual-interpretation arguments eventually fail on the merits, its arguments are not "frivolous or obviously insubstantial." *See Conrail*, 491 U.S. at 307.

The collective bargaining agreement includes a management-rights provision that states that "[e]xcept as restricted by an express provision of this Agreement, the Company shall retain all rights to manage and operate its business and workforce, including but not limited to the right . . . to transfer operations or part of operations." The union stresses that Spirit has never before operated two control centers. But the right to transfer "part" of operations plausibly includes the right to have two control centers. Although the union argues that the rights "retain[ed]" by the management-rights clause must originate in the Act or in caselaw, Spirit's argument that it retained the rights it had prior to the dispatch officers' unionization is not obviously unfounded, so the parties' disagreement about the scope of the management-rights clause does not make this a major dispute. It follows from the management-rights provision that if Spirit has a not-insubstantial argument that there is no express provision that restricts its right to transfer operations in part, its actions are arguably justified under the agreement. Spirit has satisfied its burden.

To answer whether there is any express restriction on Spirit's right to transfer operations, both parties focus on section 6 of the agreement. That section states that "[w]here the Company opts to relocate the dispatch office to a new domicile more than fifty . . . miles from its current location, the parties will meet to discuss and agree upon moving expenses for affected employees." The union contends that the relocation-expenses provision does not apply here because Spirit is not moving "*the*" dispatch office.

Spirit, for its part, argues that the use of "opts" in the provision implies that it can decide unilaterally whether to relocate its operations and that the requirement that the parties bargain over moving expenses for "affected" employees implies that some employees may be "unaffected"—as would be the case if operations were relocated only in part.

Because the management-rights provision reserves the right to transfer operations, in whole or in part, absent an *express* restriction on that right, it does not matter for purposes of this appeal whether section 6 of the agreement itself recognizes a right to transfer. That section 6 does not clearly restrict Spirit's asserted right to open a second control center is enough for Spirit's position to be arguably justified by the agreement. The union does not identify any other provision that expressly restricts the right to transfer operations.

Spirit reasonably contends that the parties "*already* bargained over and reached agreement on Spirit's right to make unilateral changes, including the right to transfer part of its operations." The Supreme Court has explained that employers and unions may bargain for terms "that grant management the power to respond flexibly to changing circumstances." *Conrail*, 491 U.S. at 309. Employers are not required "rigidly to maintain the status quo pending arbitration of their right to be flexible." *Id.* Regardless of which party's interpretation of the management-rights provision ultimately prevails, the only question for this Court is whether

Spirit's position is "frivolous or obviously insubstantial." *See Conrail*, 491 U.S. at 307. It is not.

The union next argues that the management-rights provision *cannot* reserve to Spirit the unilateral right to transfer operations. It contends that the Supreme Court has "explicitly ruled that carriers do not hold a retained right . . . to change employee[s'] work assignments in the absence of an explicit or implied contract provision prohibiting [them] from doing so." This argument fails.

We agree with the district court that the union misreads the precedents it cites. Those precedents concern the scope of the status-quo requirement during a major dispute, not the threshold jurisdictional question whether a dispute is major or minor. They have no bearing on our inquiry.

The union first points to *Shore Line*, in which the Supreme Court held that the Act required a railroad to refrain from establishing new work assignments while the parties exhausted the section 6 procedures. 396 U.S. at 152–53. The Supreme Court held that the status-quo provisions of the Act applied "regardless of the fact that the railroad was not precluded from making these assignments under the existing agreement." *Id.* at 154. In this appeal, the union points to that holding to argue that the decision "clearly excludes the existence of 'retained rights.'"

The problem for the union is that in *Shore Line* the Supreme Court explained that the question before it was "the extent to which the [Act] imposes an obligation upon the parties . . . to

maintain the status quo while the purposely long and drawn out procedures of the Act are exhausted." *Id.* at 143 (internal quotation marks and citations omitted). Everyone agreed that the dispute was major and section 6 applied; the only issue was the scope of the status-quo requirement. *See id.* at 152–53. The Court answered that when the Act's status-quo requirements are "properly invoked," both parties must maintain "actual, objective working conditions and practices," not only those working conditions expressly provided for by agreement. *Id.* at 153. *Shore Line* is unlike this appeal, in which we must first decide whether the status-quo requirement has been properly invoked.

The union next relies on *Order of Railroad Telegraphers v. Chicago & North Western Railway Co.*, 362 U.S. 330 (1960). There, the railroad sought to close some of its stations. In response, the union notified the railroad, pursuant to section 6 of the Act, that it wanted to negotiate to amend the collective bargaining agreement so that the railroad could not abolish any jobs without the union's consent. *Id.* at 332. The railroad argued that it had a managerial prerogative to close the stations and that the union's request to amend the agreement did not raise a bargainable issue under the Act. *Id.* at 332, 336. The Supreme Court rejected that argument. *Id.* at 336.

Importantly, the Supreme Court did not hold that no managerial prerogatives exist; it held that the union's request in that case was not "an attempt to usurp legitimate managerial prerogative," *id.* at 336, but instead was an attempt to settle a labor dispute

consistent with the requirements of the Act, *id.* at 339. And because the *union* was trying "to change the 'terms' of an existing collective bargaining agreement," that labor dispute was major. *Id.* at 336; *see also id.* at 341. Here, by contrast, Spirit has never contended that the dispute is not covered by the Act, and neither party has given a section 6 notice.

Finally, the union argues that a later precedent, *Pittsburgh & Lake Erie Railroad Co. v. Railway Labor Executives' Association*, 491 U.S. 490 (1989), "instructs that the holding in *Shore Line* is not limited only to the breadth of the status quo requirement in disputes where [s]ection 6 has been invoked," "erod[ing]" any distinction between *Shore Line* and this appeal. The union contends that "[i]t is of no significance that [s]ection 6 notices had been served in *Shore Line*, but not here." But the union misreads the footnote on which it relies.

*Pittsburgh & Lake Erie* explained the reasoning in *Shore Line*: when a union files a section 6 notice, the status-quo provision applies to all conditions objectively in existence at the time of filing, even if those conditions "otherwise could be changed without violating any agreement." *Pittsburgh & Lake Erie*, 491 U.S. at 506. And it "extended the relevant language of [section] 156 to its outer limits." *Id.* In the footnote on which the union relies, the Court reasoned that because section 6 of the Act deals with "intended changes in *agreements*," one arguable interpretation is that it "would not require the status quo with respect to working conditions that have never been the subject of an agreement . . . and that,

if no notice of changes had been served by the union, could be changed by the carrier without any bargaining whatsoever." *Id.* at 506 n.15. "*Shore Line* rejected that construction." *Id.*

The union reads this footnote to mean that "changes in work conditions not addressed in the agreement" are also "within the scope of the bargaining and status quo requirements," even when no party has filed a section 6 notice. That reading is plainly incorrect. *Shore Line*, as explained in *Pittsburgh & Lake Erie*, concerned the scope of the status-quo provision in a major dispute, not the classification of a dispute as major or minor.

*Pittsburgh & Lake Erie* explained that the status-quo provision applies whenever the bargaining requirement applies, even when the carrier's action, considered alone, would not trigger the bargaining requirement. But there still must be some "intended change *in agreements* affecting rates of pay, rules, or working conditions" for a labor dispute to trigger the bargaining requirement in the first place—such as a section 6 notice from the union. 45 U.S.C. § 156 (emphasis added). *Pittsburgh & Lake Erie* explained that *Shore Line* extended the status-quo provision to "conditions 'objectively' in existence when the union's notice was served . . . that *otherwise could be changed without violating any agreement.*" *Pittsburgh & Lake Erie*, 491 U.S. at 506 (emphasis added).

This appeal presents the "otherwise" scenario *Pittsburgh & Lake Erie* envisioned. The union has not filed a section 6 notice of a proposed change to the agreement, and Spirit has reasonably argued that its action does not violate the agreement. The bargaining

22-11341                Opinion of the Court                15

requirement was not triggered. *Shore Line*'s holding on the scope of the status-quo provision during bargaining is inapplicable.

## IV. CONCLUSION

We **AFFIRM** the judgment dismissing the action for lack of subject-matter jurisdiction.